## State of Vermont v. Edward Brooks

[601 A.2d 963]

No. 87-339

Present: **Allen, C.J., Peck, Dooley and Morse, JJ., and Barney, C.J. (Ret.), Specially Assigned**

Opinion Filed November 1, 1991

*Jeffrey L. Amestoy*, Attorney General, and *Susan R. Harritt*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Walter M. Morris, Jr.*, Defender General, and *David Williams*, Drug Defense Unit, Montpelier, for Defendant-Appellant.

**Allen, C.J.** Defendant moved to suppress evidence obtained when police, without a warrant, electronically overheard and recorded his conversation with a "bugged" police informant, on the ground that his rights under Chapter I, Article 11[1] of the Vermont Constitution were violated. The trial court denied the motion, and defendant brought this interlocutory appeal. We affirm.

State police, investigating a series of burglaries at automotive businesses, arrested one Keith Gordon for possession of stolen property. Gordon implicated defendant and agreed to cooperate with authorities. On the same day, Gordon called defendant on the telephone, and they arranged to meet an hour later in a shopping center parking lot. The phone conversation was taped. Defendant expressed some doubt about the security of talking to Gordon, saying "is it cool?" and "this ain't a set up?" The two later met as agreed.

At the shopping center, Gordon, equipped with a concealed transmitting device, drove alongside defendant's vehicle and they talked through open windows. A detective and another officer, parked about fifty yards away, tape recorded the conversation transmitted from Gordon's device. The officers were able to see Gordon and defendant talking. Defendant made a number of incriminating statements regarding his involvement in the burglaries. Based on the recorded conversation, police obtained a warrant to search defendant's car and home. They found stolen property and charged defendant with multiple counts of burglary, possession of stolen property and possession of a regulated drug.

---

[1] That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

■ Defendant moved "to suppress the use at trial of any evidence resulting from voice monitoring devices used by the State to listen to and record defendant's private conversations." The trial court denied the motion, relying on *Barrett v. Fish*, 72 Vt. 18, 47 A. 174 (1899), where this Court denied a motion to enjoin the production at trial of certain letters. *Barrett* is inapposite, however. That case did not involve a search and seizure under Article 11 because the government played no role in procuring the letters. *Id.* at 19, 47 A. at 175. The trial court also relied on *United States v. White*, 401 U.S. 745 (1971), which controls federal law on eavesdropping under the Fourth Amendment to the United States Constitution. In *White*, the United States Supreme Court concluded that government use of informants equipped with concealed devices to record conversations with unknowing suspects did not violate the Fourth Amendment. 401 U.S. at 751.[2] A majority of the Supreme Court has since approved the plurality's rationale in *White*. See *United States v. Caceres*, 440 U.S. 741, 750–51 (1979). Under these precedents, the police operation in this case did not violate defendant's federal constitutional rights.

■ The question squarely posed, therefore, is whether participant electronic monitoring in the circumstances presented

---

[2] Twenty-five states, applying their own constitutions or statutes, have followed *White*. See *People v. Collins*, 438 Mich. 8, 35–36 n.48, 475 N.W.2d 684, 696 n.48 (1991), *overruling People v. Beavers*, 393 Mich. 554, 227 N.W.2d 511, *cert. denied*, 423 U.S. 878 (1975). In addition to the Supreme Court of Michigan, the supreme courts of Montana, Pennsylvania, and Louisiana have overruled prior decisions requiring warrants for participant electronic monitoring. *State v. Brown*, 232 Mont. 1, 755 P.2d 1364 (1988), *overruling State v. Brackman*, 178 Mont. 105, 582 P.2d 1216 (1978); *Commonwealth v. Blystone*, 519 Pa. 450, 549 A.2d 81 (1988), *aff'd on other grounds*, 494 U.S. 299 (1990), *overruling Commonwealth v. Shaeffer*, 370 Pa. Super. 179, 536 A.2d 354 (1987); *State v. Reeves*, 427 So. 2d 403 (La. 1982), *rev'd on rehearing, State v. Reeves*, 427 So. 2d 403, 410 (La. 1983).

Two other states have declined to follow *White* under state law when considering recorded conversations within the home. *Commonwealth v. Blood*, 400 Mass. 61, 65–78, 507 N.E.2d 1029, 1031–39 (1987) (warrantless recording and transmission of private conversations with wired informer violated state constitution); *State v. Glass*, 583 P.2d 872, 880 (Alaska 1978) (Under explicit privacy provision of Alaska constitution, "the expectation that one's conversations will not be secretly recorded or broadcast should be recognized as reasonable.").

in this case violates Article 11 of the Vermont Constitution. In *State v. Blow*, 157 Vt. 513, 602 A.2d 552 (1991), we held that obtaining evidence by electronic monitoring in the defendant's home without his consent and without prior court authorization violates Article 11. The touchstone here, as in *Blow* and in *State v. Kirchoff*, 156 Vt. 1, 587 A.2d 988 (1991), is whether a defendant subject to electronic surveillance has a reasonable expectation of privacy. Referring to Justice Harlan's concurring opinion in *Katz v. United States*, 389 U.S. 347, 361 (1967), we stated in *Blow*:

> [T]he test requirements are "first that a person ha[s] exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Kirchoff* makes it clear that privacy expectations do not necessarily decline as surveillance technology advances. *Kirchoff*, 156 Vt. at 12–13, 587 A.2d at 996. The reasonableness inquiry hinges on the essence of underlying constitutional values—including respect for *both* private, subjective expectations and public norms.

157 Vt. at 517–18, 602 A.2d at 555. Applying these guidelines to the facts of this case, we find that defendant, regardless of what he actually expected, did not enjoy a reasonable expectation of privacy in a public parking lot. In that setting, conversations are subject to the eyes and ears of passersby.

■  The distinction between the reasonable expectation of privacy within the home and outside of it is well-grounded in the law and in our culture. Id. at 518–19, 602 A.2d at 556; see also *Payton v. New York*, 445 U.S. 573, 589 (1980) (deeply rooted, subjective expectation of privacy in home); *State v. Brown*, 198 Conn. 348, 356–57, 503 A.2d 566, 570 (1986) ("Privacy expectations are normally highest and are accorded the strongest constitutional protection in the case of a private home and the area immediately surrounding it."). It follows from *Blow* that participant monitoring outside of the home will not be subject to the same strict standards that we apply to such monitoring within the home of the nonconsenting target; the difference is simply a reflection of the standards that apply to nonhome searches generally. See, e.g., *Weber v. City of Cedarburg*, 129 Wis. 2d 57, 67, 384 N.W.2d 333, 339 (1986) (citizen had

neither subjective nor objective expectation of privacy in his attendance at softball game or in tavern-going).

■ We recognize that the use of informants, wired or not, intrudes upon privacy, and that the use of recording technology does not alter the essential nature of the state's act. The widespread and unrestricted use of government informants is surely one of the basic characteristics of a totalitarian state. The use of informants in law enforcement, however, has long been accepted as a necessary compromise between the ideals of a perfectly private society and a perfectly safe one. We therefore hold that warrantless electronic participant monitoring of face-to-face conversations, in cases such as this one, where defendant, located in a public parking lot, had no reasonable expectation of privacy, does not violate the protections of Article 11 of the Vermont Constitution.

*Affirmed.*

**Morse, J.,** dissenting. The Court gives meager lip service to Article 11's protection and holds Article 11 requires neither a warrant nor probable cause for the search and seizure in this case. The holding here is stated in a few words: "[D]efendant . . . did not enjoy a reasonable expectation of privacy in a public parking lot." The rationale is stated with remarkable brevity: "In that setting, conversations are subject to the eyes and ears of passersby."

The Court can mean nothing less than to allow government officials unbridled discretion to eavesdrop electronically and record conversations held outside the home. Giving Article 11 effect behind the walls of a home, *State v. Blow*, 157 Vt. 513, 602 A.2d 552 (1991), is mere token protection, because the nature of the surveillance requires but a little patience for the target to leave the home. It is no small irony that the suspect in this case was coaxed from his house by a telephone call to meet and talk in a shopping center parking lot. The police may now monitor without limitation the words of any person it considers suspect, dangerous, undesirable, or unpopular.

In analyzing situations involving exactly the same bugging device, the Court allows Article 11 protection in the home but apparently nowhere else. The Court misses the point. The con-

cept of home does not trigger Article 11 protection, see *State v. Zaccaro*, 154 Vt. 83, 91, 574 A.2d 1256, 1259 (1990) (police officer's undercover entry by invitation into defendant's home not protected by Article 11); the technological device's power to invade privacy triggers it. Article 11 focuses on personal expectations of privacy rather than defined places. See *State v. Kirchoff*, 156 Vt. 1, 10, 587 A.2d 988, 994 (1991) (lawful possessor may claim privacy in "open fields" where indicia, such as fences, barriers, or "no trespassing" signs would lead a reasonable person to conclude that the area is private); *Zaccaro*, 154 Vt. at 90, 574 A.2d at 1261 (no Article 11 protection in the home per se, because Article 11, like the fourth amendment, "protects people, not places").

Because we reasonably expect more privacy at home for some activities or in some circumstances does not necessarily mean we never reasonably expect privacy away from home. It does not follow that our expectations of privacy outside the home are per se less reasonable.

I suggest that the Court's approach is also as impractical as it is unwise. The result could at first blush be seen as an easy to apply bright-line test, a line drawn at the doorstep of the home. Yet, unanswered questions abound. Was the taped phone conversation that lured defendant from his home to the parking lot protected under *Blow*? Does it matter who initiates the call? If the target is not at home, but the informant is at home, is a telephone conversation protected? Does the home exception apply when the conversation is recorded at the informant's home? If the target gives a speech to a social club meeting in the target's home, is the speech protected?

In sum, the Court in this case discards much of what I thought Article 11 meant and instead creates a navigational signal for law enforcement. Article 11 is "on" in the home, "off" everywhere else. I dissent.

## A.

Like the Court, I believe Article 11 is implicated in this case but, unlike the Court, I do not think the privacy interest here is so diluted that Article 11 protection should be eliminated.

A reasonable expectation of privacy triggers Article 11. *State v. Kirchoff*, 156 Vt. at 11, 587 A.2d at 995. Article 11 protects

persons wherever they are in Vermont—at work, at play, at home, at the office, and even outdoors. See *id.* at 10, 587 A.2d at 994 (under Article 11, legal possessor may claim privacy in "open fields").

While espousing the reasonable expectation of privacy analysis, the Court summarily concludes that electronically intercepting and recording conversation no more intrudes on privacy than the informant's telling what he remembers of it to the police. But, the Court adds, because home has traditionally received a high degree of Article 11 protection, we reasonably expect not to be recorded there. Relegating Article 11, or fourth amendment, protection solely to the home is unsupported by any case law I can find in any jurisdiction, state or federal.

### B.

A variant of the "at-home" distinction was advanced by the federal government and soundly rejected by the United States Supreme Court in *United States v. Chadwick*, 433 U.S. 1 (1977), *rev'd on other grounds*, *California v. Acevedo*, — U.S. —, —, 111 S. Ct. 1982, 1989 (1991). The government's position in *Chadwick* was significantly less compromising of fourth amendment values than that advanced here by this Court under Article 11. In deciding whether a locked footlocker could be opened without a warrant upon probable cause, the Court described the prosecution's argument:

> [T]he Government argues that only homes, offices, and private communications implicate interests which lie at the core of the Fourth Amendment. . . . In all other situations, the Government contends, less significant privacy values are at stake, and the reasonableness of a government intrusion should depend solely on whether there is probable cause to believe evidence of criminal conduct is present.

433 U.S. at 7. The rejection of the government's position was unanimous. Even the dissent, authored by Justice Blackmun and joined by Justice Rehnquist, believed "it somewhat unfortunate that the Government sought a reversal in this case primarily to vindicate an extreme view of the Fourth Amendment." *Id.* at 17.

Chief Justice Burger, writing for the majority, said, "the protections a judicial warrant offers against erroneous governmental intrusions are effective whether applied in or out of the home," *id.* at 9–10, and concluded, on the basis of "settled law in this Court for over 90 years," *id.* at 11 n.6, that "a fundamental purpose of the Fourth Amendment is to safeguard individuals from unreasonable government invasions of legitimate privacy interests, and not simply those interests found inside the four walls of the home," *id.* at 11. The Court today gives the government's position in *Chadwick* more credence than the United States Supreme Court did. I am disturbed by the Court's parsimonious view that Article 11 offers protection against the electronic surveillance used here only in the home.

## C.

In *Blow*, 157 Vt. at 519, 602 A.2d at 556, also announced today, we recognized that a probable cause warrant requirement was the only effective way to protect privacy in the home. Although "houses" are specifically identified as protected places in Article 11, our analysis in *Blow* is not limited to a particular place. Rather, we stated our task under Article 11 is to "identify the values that are at risk, and vest the reasonable-expectation-of-privacy test with those values." *Id.* at 518, 602 A.2d at 556. The value identified in *Blow* is the right of every individual "'"to keep his own sentiments, if he pleases. He has certainly a right to judge whether he will make them public, or commit them only to the sight of his friends."'" *Id.* at 519, 602 A.2d at 556 (quoting *Commonwealth v. Blood*, 400 Mass. 61, 69, 507 N.E.2d 1029, 1033 (1987) (quoting Warren & Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 198 n.2 (1890)).

To protect this value, we should not succumb to the assumption that, because we tell a friend who might betray our confidence, we cannot reasonably expect any privacy in the conversation. Being "quoted" from memory and tape recorded for posterity are vastly different invasions of privacy. That our revelations to confidants are per se more private at home is a groundless assumption. What matters is the nature of the intrusion, not where it occurs. While the home-as-castle has considerable nostalgic appeal, it certainly is not the only place where private activities are carried out. Intimate conversation is no

less private in lovers' lanes than in living rooms. Our right to "keep [our] own sentiments" private should follow wherever a private spot and conditions may be found.

### D.

The Court cites decisions of other state courts that have declined to follow the federal rationale of *White: Commonwealth v. Blood, supra; State v. Glass*, 583 P.2d 872 (Alaska 1978). These same cases are cited with approval in *Blow*, 157 Vt. at 519, 602 A.2d at 556, though the Court points out and labels as "significant" the fact that both cases dealt with electronic surveillance in a home. Neither case, however, is grounded on a home-based rationale, and the *Glass* court specifically disavows one:

> We have previously recognized the high degree of protection surrounding the home. We decline to base our holding on this particularized protection, however, since we have concluded that the right of privacy is infringed by warrantless participant monitoring of private conversations regardless of the locus of the police surveillance.

583 P.2d at 881 n.35 (citations omitted). Although *Blood* contains no such disclaimer, its rationale is tied broadly to "liberties of the person" to be a full member of society. 400 Mass. at 69–70, 507 N.E.2d at 1034 (quoting *Lopez v. United States*, 373 U.S. 427, 470 (1963) (Brennan, J., dissenting)); see also *id.* at 69, 507 N.E.2d at 1034:

> [I]t is not just the right to a silent, solitary autonomy which is threatened by electronic surveillance: It is the right to bring thoughts and emotions forth from the self in company with others doing likewise, the right to be known to others and to know them, and thus to be whole as a free member of a free society.

Neither of these rationales are home-based. The individual's need for access to conversation, society's need for interchange of ideas, and the constitutionally mandated warrant requirement are all equally compelling, even more compelling in many situations, when applied to activities outside the home.

### E.

The Court embraces the United States Supreme Court decisions in *United States v. White*, 401 U.S. 745 (1971), and *United*

*States v. Caceres*, 440 U.S. 741 (1979). It accepts a rationale that people should assume the risk that their words will be electronically captured and, I believe, misconstrues and underestimates the intrusiveness of the informant's use of recording devices. The Court concludes that "the use of recording technology does not alter the essential nature of the state's act." The difference in the nature of the intrusion, however, is precisely what is at issue.

I agree with the sentiment expressed recently by the Supreme Judicial Court of Massachusetts that "[t]he world of the *White* thesis is a topsy-turvy one in which the paranoid's delusory watchfulness is the stance held 'reasonable.'" *Blood*, 400 Mass. at 73 n.13, 507 N.E.2d at 1036 n.13. That court concluded that "it has long been thought reasonable to expect that what is supposedly said only to friends or close associates will not become generally, indiscriminately known or 'etched in stone' without the speaker's consent." *Id.* at 69, 507 N.E.2d at 1033.

I also agree with Justice Harlan's *White* dissent, where he argued that monitoring technology alters the nature of the assumption of the risk that a false friend may report one's words. About this, Harlan observed:

> Much off-hand exchange is easily forgotten and one may count on the obscurity of his remarks, protected by the very fact of a limited audience, and the likelihood that the listener will either overlook or forget what is said, as well as the listener's inability to reformulate a conversation without having to contend with a documented record. All these values are sacrificed by a rule of law that permits official monitoring of private discourse limited only by the need to locate a willing assistant.

401 U.S. at 787–89 (footnote omitted); for further critical comment see *Holmes v. Burr*, 486 F.2d 55, 72 (9th Cir.) (Hufstedler, J., dissenting), *cert. denied*, 414 U.S. 1116 (1973); *Blood*, 400 Mass. at 67 n.8, 507 N.E.2d at 1032 n.8 (citing literature critical of the *White* doctrine and decision); 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.2(e), at 364 (2d ed. 1987) (approving Harlan's approach).

## F.

In examining the reasonable expectation of privacy, the Court today not only fails to take into account the concerns I have already expressed but also fails to analyze any indicia of society's regard for privacy. A home/not home distinction does not reflect reality. In analyzing what society legitimately deems as private, we are not limited to theoretical abstractions. Social norms—as well as law—should be considered.

The development of tort law is one such indicia. During most of the nineteenth century, governments did not have sophisticated technology enabling them to conduct close surveillance from a distance. The late 1880s saw the development of the telephone, the microphone, and photography. Katz, *In Search of a Fourth Amendment for the Twenty-first Century*, 65 Ind. L.J. 549, 557 n.41 (1990). Contemporaneous but not coincidental with the development of this technology was the development of the "right to privacy," a concept widely credited to Warren & Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890) (looking at a variety of cases where courts had recognized some form of a "right to be let alone").

By the 1930s, the concept of privacy was fully accepted in the law of torts. See Restatement of Torts § 867 (1939) (approving an action for "unreasonable and serious" interference with privacy). In the Restatement (Second) of Torts (1977), four separate invasion of privacy torts are recognized: intrusion upon seclusion, § 652B; appropriation of another's name or likeness, § 652C; unreasonable publicity given to other's private life, § 652D; and publicity that unreasonably places another in a false light before the public, § 652E. By 1980, Rhode Island was the only state not recognizing a right-of-privacy tort. W. Keeton, Prosser and Keeton on Torts § 117, at 851 (5th ed. 1984); Note, *Tort Recovery for Invasion of Privacy*, 59 Neb. L. Rev. 808, 808-10 (1980). In Vermont, one form of the tort has been explicitly recognized, *Staruski v. Continental Telephone Co.*, 154 Vt. 568, 572–73, 581 A.2d 266, 268 (1990) (appropriation of a person's name or likeness), and two other forms have been less directly recognized, *Lemnah v. American Breeders Service, Inc.*, 144 Vt. 568, 574, 482 A.2d 700, 704 (1984) (unreasonable publicity to a person's private life and publicity that places a person in a false light). I see no societal movement to reverse

the trend protecting persons from tortious interference with their privacy.

The wiretap at issue here qualifies as both an appropriation and an unreasonable intrusion. A private detective engaging in behavior identical to that of the police here would be subject to a tort action. See *Dietemann v. Time, Inc.*, 449 F.2d 245, 247 (9th Cir. 1971) ("In jurisdictions [where] a common law tort for invasion of privacy is recognized, it has been consistently held that surreptitious electronic recording of a plaintiff's conversation causing him emotional distress is actionable."); *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 569–70, 255 N.E.2d 765, 770-71, 307 N.Y.S.2d 647, 654–55 (1970) (unauthorized private wiretapping and eavesdropping by mechanical and electronic means are tortious actions). See also Katz, *In Search of a Fourth Amendment for the Twenty-first Century*, 65 Ind. L.J. at 574 ("Core fourth amendment values are harmed when government actors are given license to behave in ways that would be intolerable if undertaken by private members of the community.").

Nor is law the only indicia of society's regard for privacy. The individual's desire for and even need for privacy has been well documented by scholarly writers in a variety of fields, including sociology, see, e.g., E. Shils, *Center and Periphery* 317–44 (1975) (arguing that privacy is vital to an individual's humanity, which the government must allow in order to gain their citizens' trust and support), social psychology, see, e.g., I. Altman, *The Environment and Social Balance* 48–49 (1975) (privacy is necessary for the development of individual self-identity and personal autonomy), and anthropology, see, e.g., B. Moore, *Privacy: Studies in Social and Cultural History* 75-76 (1984) (in modern, literate societies, privacy—defined in part as a need for confidential exchanges of information—serves important social interests).

We noted in *Kirchoff* that no empirical evidence had been presented that society was unwilling to recognize as reasonable an expectation of privacy in "open fields." 156 Vt. at 9, 587 A.2d at 993. We also emphasized that society's views about what is reasonable may shift with "exigencies of the day," so that ultimately we look at "not what society is prepared to accept [at any given moment] but what the constitution requires." *Id.* at

12, 587 A.2d at 995–96. Nonetheless, we need not ignore all empirical evidence about the value that society places on privacy, even though this factor is prone to effervescence.

In the 1970s, Louis Harris and Associates, Inc., conducted a series of opinion polls designed to measure growing public concern about the erosion of privacy by new technologies of data processing and surveillance. See Harris & Westin, *The Dimensions of Privacy* 3 (1981). A December 1978 Harris poll concluded that Americans were "greatly concerned about threats to their personal privacy" and that this concern "is pervasive." *Id.* at 5. Three out of four Americans believed in a "right to privacy" equivalent to the rights of "life, liberty and the pursuit of happiness." *Id.* Roughly one-half feared that within ten years, "we will have lost much of our ability to keep important aspects of our lives private from government." *Id.* A fifth of all Americans surveyed believed that their privacy had already been invaded. *Id.* at 18.

Although the survey included questions on a wide variety of privacy invaders, including credit companies, insurance companies, and the press, the single greatest number of reported invasions of privacy were by "police searching without warrants" (19%). *Id.* at 19. Overwhelming percentages of the respondents opposed nonwarranted phone taps (87%), inspection of mail (92%), and bank records (81%). *Id.* at 69. Nine percent believed that they had been the subject of a phone tap. *Id.* at 5. These figures suggest that Americans see privacy as highly valuable and severely threatened, that government, particularly the police, is viewed as a major invader of privacy, and that warrants are commonly understood to be privacy's primary protection.

## G.

The Court's decision today, in my opinion, is inharmonious with its recent Article 11 jurisprudence. Although the type of police investigation in the present case is different from that analyzed in *Kirchoff*, the Article 11 analysis is similar. "Article 11 protects the people from governmental intrusion into their private affairs; to the extent their affairs are willingly made public, the provision has no application." 156 Vt. at 7, 587 A.2d at 993. Had he made his words public, defendant would not be

entitled to claim Article 11 protection. Similarly, in *State v. Zaccaro*, we held that a suspect who invited an undercover police officer whom he did not know into his apartment and proceeded to sell her cocaine could not claim protection under Article 11, since "by opening his home to members of the public, including those interested in procuring drugs, defendant implicitly consented to a 'search' of his home within the scope of his invitation." 154 Vt. at 90, 574 A.2d at 1261.

Defendant, however, did not make his words public. The Court concludes that by talking through open car windows in a parking lot in public view, defendant subjected his conversation "to the eyes and ears of passersby" and hence had neither a subjective nor objective expectation of privacy. I disagree.

The Court cites only one case on an individual's expectations of privacy in public places, *Weber v. City of Cedarburg*, 129 Wis. 2d 57, 384 N.W.2d 333 (1986). In *Weber*, the court held that a plaintiff could not state a § 1983 claim when police visually monitored his movements without probable cause that he was about to commit a crime. The court, following *Katz v. United States*, 389 U.S. 347, 351 (1967), held that the fourth amendment did not protect "what a person knowingly exposes to the public" and plaintiff had no expectations of privacy in his public movements absent an allegation that he was not in plain view. *Id.* at 67, 384 N.W.2d at 339. But what can be seen and what can be heard are not identical.

While defendant did not hide himself and his activities were plainly visible to the police, his conversations were not audible by ordinary means and were certainly not publicly broadcast. He had earlier expressed concern about a setup. The meeting was clandestine; it is obvious that he sought to keep the conversation quiet and confidential. What defendant "sought to exclude . . . was not the intruding eye—it was the uninvited ear." *Katz*, 389 U.S. at 352. Defendant hid only what he wanted to hide from public scrutiny, his words. Defendant's conversation here was unambiguously private.

Although the Court concedes that "widespread and unrestricted use of government informants is surely one of the basic characteristics of a totalitarian state," the two checks or controls provided by Article 11, probable cause and judicial warrant, are eliminated.

Allowing warrantless electronic participant monitoring of conversations by law enforcement officers is not, as the Court

suggests, "a necessary compromise between the ideals of a perfectly private society and a perfectly safe one." The Court today does not "compromise." Nothing whatsoever of Article 11. protection remains.

This case undermines Article 11's core values far more than any other Article 11 case. In *State v. Record,* 150 Vt. 84, 548 A.2d 422 (1988), we upheld the constitutionality under Article 11 of a warrantless DUI roadblock. Recognizing the impracticality of acquiring reasonable suspicion to stop impaired drivers, and characterizing the need to deal with the public safety threat posed by them as "compelling," *id.* at 89–90, 548 A.2d at 426, we balanced this need against the relatively minor and brief intrusion on privacy caused by the roadblock in favor of the controlled use of DUI checkpoints. We further justified this result on the ground that Article 11's preference for warrants issued by magistrates was ameliorated by the use of

> written, objective police policies based on clear judicial guidelines which effectively circumscribed officer discretion, and effectively avoided the evil sought to be prevented by the prohibition of general warrants.

*Id.* at 86, 548 A.2d at 423–24. At the same time, we warned that

> the use of a balancing analysis to uphold the constitutionality of a roadblock seizure carries with it the dangerous potential for further extension of this type of intrusion upon the rights of citizens to travel unimpeded.

*Id.* at 89, 548 A.2d at 425–26. Only a "compelling" need could require the balancing test and ultimately tip the balance.

In *State v. Berard,* 154 Vt. 306, 576 A.2d 118 (1990), we upheld under Article 11 a warrantless search of a prison cell conducted under Department of Corrections guidelines calling for routine, unannounced, and random "shakedown" searches of all inmate cells. Again we adopted a balancing test for a "special need," i.e., one exceeding normal law enforcement needs, which required abandoning as impractical the warrant and probable cause requirements. *Id.* at 311, 576 A.2d at 121. And again we emphasized that exceptional circumstances must be present to require a balancing test and that the test must be performed in a manner that interferes least with the preservation of Article 11 rights. *Id.* at 313–14, 576 A.2d at 122.

The *Berard* Court found that the state had a "special need" to operate its prisons safely and the prisoners' expectation of privacy was "considerably diminished at best." *Id.* at 311, 576 A.2d at 121. Therefore, the Court balanced "the State's 'paramount interest in institutional security' against the inmates' residuum of privacy rights," *id.* at 313, 576 A.2d at 122, and concluded that cell searches were permissible if conducted under clear objective guidelines and with guarantees to prevent singling out inmates without probable cause or articulable suspicion. *Id.* at 314, 576 A.2d at 122.

The Court noted that "a driver [at a *Record* checkpoint] is inherently entitled to a higher expectation of privacy than a prison inmate," *id.* at 314 n.3, 576 A.2d at 122 n.3, and, even in the case of inmates, "the State does not have an unfettered right to invade [their] privacy" and "in conducting random searches, must adhere to the basic safeguards we have announced." *Id.* at 317, 576 A.2d at 124.

In stark contrast, a person, innocent of wrongdoing and suspected of none, who enjoys freedom outside prison walls (and the walls of home) is subject in this case to less protection under Article 11 than a prison inmate. Today's decision does not use a balancing test nor does it require the state to show a "special need" to justify the electronic surveillance, nor are any safeguards required to guide and restrain police conduct.

The most potent protection of Article 11 is the prevention of dubious searches and seizures from happening at all. Innocent people are spared and overzealous authorities are prevented from snooping for dirt on anyone they choose. We emphasized in a recent decision the importance of the warrant requirement, stating: "The warrant requirement brings a significant check on law enforcement conduct, because not just fruitful searches will be on the record, and searches on doubtful grounds may not be attempted at all if authorities know they must first go before a judicial officer." *State v. Savva,* — Vt. —, —, 616 A.2d 774, 780 (1991). We concluded that the warrant requirement "is and must remain a central part of Article 11" and that "[a]ny exceptions . . . must be factually and narrowly tied to exigent circumstances and reasonable expectations of privacy." *Id.* at —, 616 A.2d at 781. The warrant requirement is basic to the guarantee of individual freedoms. Rooted in the separation and balance of

powers, it provides a restraint on executive power by requiring review under the judicial power before an invasion of privacy can occur. Here, the judiciary is given no role.

The need for a warrant requirement is even more compelling in this case than in the automobile and container cases analyzed in *Savva*. The nature of electronic technology is such that warrantless searches and seizures will occur without the knowledge of those spied upon. Without a warrant requirement, innumerable innocent people may be listened to and recorded. Indeed, not even after-the-fact review of the search and seizure leading to criminal charges is available because the police do not need probable cause to search. The social costs of the surveillance system the Court allows are too high.

No exigency rationale applies here; no one has argued that it would have been impractical to get a warrant. The Court is sacrificing a major Article 11 protection solely for the sake of expedience. This expedience may be justified solely on the notion that a recording of a conversation is more accurate than memory of it. The fruits of illegal searches, however, would always be admissible under such a rationale. The goal that a trial is a search for the truth simply does not justify the use of any means to acquire evidence. My view would not end police surveillance, but it would ensure its reasonable use.

I would reverse and remand.