**STATE of Alaska, Petitioner,**

**v.**

**Edward PAGE, Jr., Respondent.**

**No. S–7555.**

Supreme Court of Alaska.

Mar. 3, 1997.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

### ORDER

IT IS ORDERED:

The petition for hearing previously granted on April 22, 1996, is hereby DISMISSED as improvidently granted.

Entered by direction of the court at Anchorage, Alaska on March 3, 1997.

MATTHEWS, Justice, with whom EASTAUGH, Justice, joins, dissenting.

I. *Introduction*

Edward Page is charged with selling cocaine to an undercover police informant. The sale took place in an apartment which had been furnished to the police and was videotaped by a hidden camera. No warrant was obtained authorizing the videotaping. The police officers did not record the audio portion of the transaction. The State sought to use the videotape as evidence. The trial court suppressed it because of the holding of *State v. Glass,* 583 P.2d 872 (Alaska 1978). The court of appeals affirmed in *State v. Page,* 911 P.2d 513 (Alaska App.1996).

*Glass* held that the audio recording of a conversation in which a police agent was a participant could not be admitted as evidence

at trial unless the recording was authorized by a warrant. Now the question is whether *Glass* applies to soundless videotaping. A majority of this court has decided to dismiss the petition in this case as improvidently granted. I would decide the case on the merits.

The central rationale of *Glass* rests on the high value placed on speech by our society. The *Glass* court was concerned with the possibility that secret tape recording by police would inhibit private discourse. As that rationale has no counterpart where only conduct, and not speech, is recorded, *Glass* is distinguishable and does not control the decision in this case.

As between Page and the police informant, the transaction in question was not private. The informant can testify in court as to what occurred. Admission of the video tape may serve to confirm or contradict the informant's testimony as to the visually observable details of what took place. It will assist in the discovery of the truth without threatening constitutionally protected values. Therefore, the tape should not have been suppressed.

II. *Glass Does Not Apply to This Case*

A. *The Rationale of Glass*

In *Glass* we held that police can not without a warrant secretly record a conversation even though a participant in the conversation consents to the recording.[1] Audio recording by, or with the consent of, a participant to a conversation is permitted under federal law.[2] The overwhelming majority of state courts also allow the practice.[3] These jurisdictions accept the argument that because the police agent/participant can testify from memory as to what was said, the effect of the recording is to ensure the reliability of the testimony.

---

1. The conversation which was recorded in *Glass* took place in the defendant's home. *State v. Glass,* 583 P.2d 872, 874 (Alaska 1978). Recognizing "the high degree of [constitutional] protection surrounding the home," we nonetheless declined to limit our holding on the basis of "this particularized protection." *Id.* at 881 n. 35.

2. *See United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

3. *See* authorities compiled at 1 Wayne R. LaFave, *Search and Seizure* § 2.2(e), at 447 n. 221 (3d

ed.1996). Apart from Alaska, it seems that only courts in Massachusetts and Vermont limit the admissibility of participant-monitored audio recordings. *Id.* Vermont applies its counterpart rule only when the recording is made in the defendant's home. *State v. Brooks,* 157 Vt. 490, 601 A.2d 963, 964 (1991) ("[D]istinction between reasonable expectation of privacy within the home and outside of it is well-grounded in the law and in our culture.").

To be sure, such conversations are private, but the participant has the right, through oral testimony, to make public what was said. The tape recording adds veracity to the process.

This rationale was expressed by Mr. Justice White writing for the plurality of the United States Supreme Court in *United States v. White*, 401 U.S. 745, 751, 91 S.Ct. 1122, 1125–26, 28 L.Ed.2d 453 (1971) (citations omitted):

> Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.[4]

Standing alone, this argument is strong, and it seemed so to me when I joined in the *Glass* majority opinion. If it is refutable it is only because it ignores the general and long-term effect that secret participant monitoring might have on private discourse. This was the basis for Justice Harlan's dissent in *White*.[5] We adopted a similar rationale in *Glass*.

A review of the *Glass* decision makes it clear that the risk of inhibiting spontaneous

---

4. Justice Burke's dissent in *Glass* employed similar reasoning:

> Unquestionably, as recognized by the superior court, and even respondent, [the police agent] would be entitled to testify concerning her own dealings with Glass and to relate the conversations surrounding those dealings to the best of her recollection. Therefore, the electronic recording of those conversations was not an invasion of respondent's privacy. The electronic recording simply provided an accurate record of the incriminating statements made to [the agent] and it is undisputed that [the agent] could testify personally as to these statements. As stated in *Lopez v. United States*, [373 U.S. 427, 439, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462 (1963)]:
>
> > Stripped to its essentials [respondent's] argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent's memory or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory.

*Glass*, 583 P.2d at 886.

5. Justice Harlan stated:

> Authority is hardly required to support the proposition that words would be measured a good deal more carefully and communication inhibited if one suspected his conversations were being transmitted and transcribed. Were third-party bugging a prevalent practice, it might well smother that spontaneity—reflected in frivolous, impetuous, sacrilegious, and defiant discourse—that liberates daily life. Much offhand exchange is easily forgotten and one may count on the obscurity of his remarks, protected by the very fact of a limited audience, and the likelihood that the listener will either overlook or forget what is said, as well as the listener's inability to reformulate a conversation without having to contend with a documented record. All these values are sacrificed by rule of law that permits official monitoring of private discourse limited only by the need to locate a willing assistant.
>
> . . . .
>
> ... The interest *On Lee* fails to protect is the expectation of the ordinary citizen, who has never engaged in illegal conduct in his life, that he may carry on his private discourse freely, openly, and spontaneously without measuring his every word against the connotations it might carry when instantaneously heard by others unknown to him and unfamiliar with his situation or analyzed in a cold, formal record played days, months, or years after the conversation. Interposition of a warrant requirement is designed not to shield "wrongdoers," but to secure a measure of privacy and a sense of personal security throughout our society.

*White*, 401 U.S. at 787–90, 91 S.Ct. at 1144–45 (footnotes omitted).

discourse was central to the value judgment which we made.[6] We began our discussion of why participant-monitored tape recording should not be countenanced with an iteration of Judge Hufstedler's dissent in *Holmes v. Burr*, 486 F.2d 55 (9th Cir.), *cert. denied*, 414 U.S. 1116, 94 S.Ct. 850, 38 L.Ed.2d 744 (1973). We quoted her dissent at length; all of the excerpts sounded the theme of the importance of free expression:

> In a pluralistic society dedicated to liberal democratic traditions, confidential communication serves as a lubricant for the smooth functioning of social and political institutions. Without "uninhibited, robust, and wide-open" public and private expression on the great issues of our day, as well as private discussion about the mundane, the trivial, and the banal, a once free society will soon become a nation of "hagridden and furtive" people.
>
> . . . .
>
> The corrosive impact of warrantless participant monitoring on our sense of security and freedom of expression is every bit as insidious as electronic surveillance conducted without the consent of any of the parties involved. In terms of the individual's reluctance to speak freely no qualitative difference exists between the danger posed by third party interception and the risk that his auditor has sanctioned a secret recording of their conversation. Extensive police-instigated and clandestine participant recordings, coupled with their use as evidence of any self-incriminating remarks of the speaker, pose "a grave danger of chilling all private, free, and unconstrained communication.... In a free society, people ought not to have to watch their every word so carefully." *Lo-*

pez v. United States, ... 373 U.S. at 452, 83 S.Ct. at 1395 (Brennan, J., dissenting).

. . . .

> Repetition of conversations thought to be confidential is a known risk. However, the risk that one's trusted friend may be a gossip is of an entirely different order than a risk that the friend may be transmitting and recording every syllable. The latter risk is not yet rooted in common American experience, and it should not be thrust upon us: the differences between talking to a person enswathed in electronic equipment and one who is not are very real, and they cannot be reduced to insignificance by verbal legerdemain. All of us discuss topics and use expressions with one person that we would not undertake with another and that we would never broadcast to a crowd. Few of us would ever speak freely if we knew that all our words were being captured by machines for later release before an unknown and potentially hostile audience. No one talks to a recorder as he talks to a person.

*Glass*, 583 P.2d at 877 (quoting *Holmes*, 486 F.2d at 65–66, 71) (footnote omitted).

We restated Judge Hufstedler's rationale, and applied it to the case before us. Again, our concern was with speech and its inhibition:

> In the case at bar, the state argues that there is no difference between talking to a friend who repeats what is told in confidence and talking to one with a transmitter or recorder. All one needs do to refute that statement is to ask the question of oneself; would it make a substantial difference to the speaker to assume the risk, not

---

6. *Glass* was decided using the framework of the test expressed by Justice Harlan in his concurrence in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The relevant question when employing this test is whether a challenged police activity violates an expectation of privacy "that society is prepared to recognize as reasonable." *Glass*, at 875. Ultimately the *Katz* test requires "a value judgment. It is whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would

be diminished to a compass inconsistent with the aims of a free and open society." 1 W. LaFave, *supra*, § 21(d), at 393 (quoting Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L.Rev. 349, 403 (1974)). The value of the challenged police practice is also relevant. Whether an expectation of privacy is justified "must ... be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement." *United States v. White*, 401 U.S. at 786, 91 S.Ct. at 1143 (Harlan, J., dissenting).

only that one's confidence will be betrayed by oral recollections, but also the risk that one's remarks will be secretly recorded or broadcast? Certainly, many of the casual, the caustic, the irreverent remarks would be inhibited, as would criticism of individuals and policies. The employee could not with impunity point to shortcomings in his superiors or in the functions of his office. Families could not freely discuss the foibles of others. Clever prodding may elicit thoughtless comments about sex, religion, politics, acquaintances, personal finances and even one's innermost thoughts. One takes the risk that his friend may repeat what has been said. One shouldn't be required to take the additional risk of an entirely different character—that his conversation is being surreptitiously transcribed or broadcast.

A confidence repeated by a false friend is received by third parties with the attendant circumstances of the "friend's" credibility and memory. One's ill-considered remarks are not thereby preserved for posterity on the reels of magnetic tape nor insulated from the faded memories inherent in the passage of time. Faced with the choice of silence or the risk that comments will be "etched in stone," a speaker may choose the former alternative, to the manifest diminution of the spontaneity which marks our daily discourse.

*Glass,* 583 P.2d at 877–878.

### B. *Quinto Explained and Modified Glass*

In *City & Borough of Juneau v. Quinto,* 684 P.2d 127 (Alaska 1984), the absence of a risk that speech might be chilled was dispositive to our decision not to apply *Glass* to the facts presented. Quinto, a drunk driving suspect, was interviewed by a police officer in the field. The officer secretly recorded the conversation. The court of appeals held that the recording should be suppressed. *Quinto v. City & Borough of Juneau,* 664 P.2d 630 (Alaska App.1983). The court noted that "one of the basic premises of ... *Glass* is that warrantless monitoring of conversations has a definite chilling effect upon freedom of expression when only one of the participants has consented." *Id.* at 635. Implicitly

recognizing that this rationale did not readily apply to investigative contacts with known police officers, the court of appeals based its holding on what it regarded as the more general principle underlying *Glass:*

> However, there is also broad language implying that the warrant requirement is applicable to the situation posed by the present case:
>
> > [W]e believe that Alaska's privacy amendment prohibits the secret electronic monitoring of conversations upon the mere consent of a participant.... We conclude that the expectation that one's conversations will not be secretly recorded or broadcast should be recognized as reasonable.

*Quinto,* 664 P.2d at 635–36 (quoting *Glass,* 583 P.2d at 879–80) (alteration in original).

We reversed the court of appeals' decision in *Quinto.* We reasoned that *Glass* did not apply because there is no risk of inhibiting confidential speech when citizens know they are speaking with a police officer who is conducting an investigation:

> Article I, section 22 fosters and protects those values and characteristics typical of and necessary for a free society. Some of these are the sharing of thoughts and ideas, personal trust between individuals, free expression, and individuality. While it is certainly true that surreptitious recording of conversations between citizens can have a chilling effect on such forms of freedom, this effect is rendered de minimis when one is aware, or reasonably should be aware, that he or she is speaking to a police officer who is in the process of executing either a lawful arrest or a lawful investigative stop. In such case, one's candor and willingness to share personal confidences are unlikely to be any more effectively chilled than they already are by the added possibility that what is being said may be electronically recorded.

*Quinto,* 684 P.2d at 129.

In reaching this conclusion we disavowed the court of appeals' reading of *Glass,* urged by the public defender, that *Glass* prohibits secret recording independent of whether it might have a chilling effect on speech.

Recognizing that there is some language in *Glass* which could support this reading, we held that *Glass* should be modified:

> The Public Defender Agency, appearing as amicus curiae, argues that it is the fact of recording, not police presence, which is critical to our decision. For the reasons stated in the text of this opinion, we disagree. To the extent that *Glass* can be read to suggest otherwise, it is modified.

*Quinto*, 684 P.2d at 129 n. 8.

*Glass* then, both taken alone and as modified by *Quinto*, is based on the primacy of free speech. Where there is a type of participant monitoring which does not threaten to inhibit speech, that type of monitoring is not addressed by the *Glass* decision. In the present case, speech is not involved. Sought to be displayed to the trier of fact is the defendant's conduct, not what the defendant said. Thus, *Glass* does not compel the result reached by the court of appeals in this case.

### III. *Participant-Monitored Video Recording Is Not Inconsistent with Basic Freedoms*

Although *Glass* is distinguishable from the present case, the type of value judgment embodied in the *Katz* test must still be made. To put the question in the context of this case, one must ask whether secret, soundless videotaping by the police in the presence of and with the consent of a participant to a transaction which takes place in an apartment controlled by the police to which outsiders are invited for the purpose of transacting business unacceptably burdens privacy or other basic freedoms. For a number of reasons, I suggest that a negative answer should be given to this question.

First, videotaping, like audio recording, often provides valuable evidence. We have held that due process not only permits but requires the police to electronically record their questioning of suspects "when the interrogation occurs in a place of detention and recording is feasible." *Stephan v. State*, 711 P.2d 1156, 1159 (Alaska 1985). In *Stephan* we noted that "a tape recording provides an objective means for evaluating what occurred during interrogation." *Id.* at 1161 (quoting *Harris v. State*, 678 P.2d 397, 414 (Alaska

App.1984) (Singleton, J., concurring and dissenting)). As such, an electronic recording advances the process of ascertaining the truth and acts neutrally to protect whichever party is telling the truth:

> Although there are undoubtedly cases where the testimony on one side or the other is intentionally false, dishonesty is not our main concern. Human memory is often faulty—people forget specific facts, or reconstruct and interpret past events differently.

> It is not because a police officer is more dishonest than the rest of us that we ... demand an objective recordation of the critical events. Rather, it is because we are entitled to assume that he is no less human—no less inclined to reconstruct and interpret past events in a light most favorable to himself—that we should not permit him to be a "judge of his own cause."

Kamisar, [*Forward: Brewer v. Williams— A Hard Look at a Discomfitting Record*, 66 Geo. L.J. 209 (1977–78) ] (citation omitted). Defendants, undoubtedly, are equally fallible.

In the absence of an accurate record, the accused may suffer an infringement upon his right to remain silent and to have counsel present during the interrogation. Also, his right to a fair trial may be violated, if an illegally obtained, and possibly false, confession is subsequently admitted. An electronic recording, thus, protects the defendant's constitutional rights, by providing an objective means for him to corroborate his testimony concerning the circumstances of the confession.

The recording of custodial interrogations is not, however, a measure intended to protect only the accused; a recording also protects the public's interest in honest and effective law enforcement, and the individual interests of those police officers wrongfully accused of improper tactics. A recording, in many cases, will aid law enforcement efforts, by confirming the content and the voluntariness of a confession, when a defendant changes his testimony or claims falsely that his constitutional rights were violated. In any case, a re-

cording will help trial and appellate courts to ascertain the truth.

*Id.* The recording required by *Stephan* may be surreptitious. *Id.* at 1162 n. 20.

As previously noted, where two or more people participate in a transaction one of them may testify as to what occurred. Thus even though the transaction may be thought by one participant to be private and confidential, another participant may make it public. Admitting a videotape of the transaction is objective proof of what took place. This is especially useful in cases where a participant's credibility is in doubt, which is often the case where a witness has engaged in the purchase or sale of illegal drugs. Similarly, where the defendant occupies a high status position relative to the other participant, videotaping may be an essential tool in persuading the jury of the defendant's guilt. *See, e.g., United States v. Myers,* 692 F.2d 823 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 2438, 77 L.Ed.2d 1322 (1983) (The "Abscam" cases: four Congressmen were convicted of bribery—hidden cameras showed them accepting money.).[7]

Second, and despite the view of most of our sister jurisdictions, it is possible to make a reasonable case against secret participant-monitored audio recording based on the potential danger that this practice will inhibit speech. We did this in *Glass,* based in part on reasons expressed by Judge Hufstedler in dissent in *Holmes v. Burr,* and Justice Harlan in dissent in *United States v. White.* However, I do not think a similarly reasonable case can be made where only conduct and not speech is being recorded. There is no conduct which is equivalent to the "frivolous, impetuous, sacrilegious and defiant discourse" found liberating to daily life by Justice Harlan; none analogous to "confidential communication [which] serves as a lubricant for the smooth functioning of social and political institutions" which Judge Hufstedler sought to protect; nor is there conduct similar to "thoughtless comments about sex, religion, politics, acquaintances, personal finances and ... one's innermost thoughts" with which *Glass* was concerned. When what may be recorded in the presence of a false friend is conduct, and not speech, the activities likely to be inhibited are those that society does not greatly value.

Third, the place where videotaping occurred—an apartment of a stranger to the defendant—and the purpose of the defendant's visit—a commercial transaction (legal or otherwise)—are of such character that secret videotaping is in no sense an offensive intrusion into the privacy of one in the position of Page.

The Supreme Court of the United States has held that even the occupant of a home loses his justified expectation of privacy when the occupant invites outsiders into the home for commercial purposes:

> [W]hen, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant.

*Lewis v. United States,* 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966).

Although commercial premises are entitled to protection against unreasonable searches and seizures, "[i]t is a fair generalization ... that business and commercial premises are not as private as residential premises, and that consequently there are various police investigative procedures which may be directed at such premises without the police conduct constituting a Fourth Amendment search." 1 W. LaFave, *supra,* § 2.4(b), at 531. Electronic surveillance in commercial premises has come to be routine and many legitimate sale transactions are subject to video or audio taping for record keeping and security purposes.

---

7. No one familiar with the events following the Watergate burglary can doubt the usefulness of participant-monitored audio recordings in convincingly revealing illegal conduct by high officials. *See United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

The Supreme Judicial Court of Massachusetts, which as noted limits the admissibility of participant monitored recordings, *Commonwealth v. Blood,* 400 Mass. 61, 507 N.E.2d 1029 (1987), has indicated that when conducting a transaction in a place and with a purpose similar to the present case, a participant has no reasonable expectation of privacy:

> We shall assume that the defendant had an expectation of privacy in his conversations in the motel room. Society is not prepared, however, to accept any such expectation as reasonable. The defendant and his associates were engaged in negotiating a major business transaction with people whom he had just met, and whom his associates had first met the day before. Nevertheless, he brought $121,000 in cash to a motel room that was not registered in his name, but rather in the name of someone about whom he knew almost nothing. He engaged in an arm's length business negotiation with strangers in a place over which he had neither control nor a right to control and which had been selected by strangers.
>
> . . . .
>
> Any rule that would exclude objective evidence, presumably more accurate than human memory, of events happening and words spoken in the motel room should have a strong justification. A warrantless electronic surveillance in a person's home, even with the consent of one participant in the conversations, can provide that justification, and, even there, not everyone agrees.... The circumstances of this case, however, provide no reasonable justification for excluding relevant, instructive, unbiased, and seemingly accurate evidence bearing on the guilt or innocence of the defendant.

*Commonwealth v. Price,* 408 Mass. 668, 562 N.E.2d 1355, 1358–59 (1990) (citations omitted).

Finally, in no other American jurisdiction would a videotape taken under circumstances similar to those in this case be suppressed. This fact represents much accumulated wisdom and experience. It implies that the practice reflected here does not present an unacceptable threat to basic freedoms.

### IV. *Conclusion*

In sum, the rationale of *Glass* was based on the danger that secret participant-monitored recording was thought to present to private discourse. In *Quinto* we expressly modified *Glass,* disapproving of language implying that secret recording was prohibited regardless of whether discourse might be inhibited. Since soundless videotaping does not threaten speech, *Glass* is distinguishable and does not control. Viewing the transaction in this case independent of *Glass,* I conclude that a person in a position similar to that occupied by Page has no expectation that society is prepared to accept as reasonable that what is occurring is not being videotaped with the consent of a participant. For these reasons I would reverse the decision of the court of appeals.