## State of Vermont v. Michael N. Costin

[720 A.2d 866]

No. 96-624

Present: **Dooley, Morse and Johnson, JJ., and Allen, C.J. (Ret.) and Gibson, J. (Ret.), Specially Assigned**

Opinion Filed July 31, 1998

*William H. Sorrell,* Attorney General, and *David Tartter,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Barry E. Griffith* of *Griffith & Lundeen, P.C.,* Rutland, for Defendant-Appellant.

**Dooley, J.** Defendant Michael Costin appeals the denial of his motion to suppress a videotape showing him cultivating marijuana plants in violation of 18 V.S.A. § 4230(a)(2). He contends that, under Chapter I, Article 11 of the Vermont Constitution, the police are required to obtain a warrant before conducting video surveillance on private property. Thus, he argues, the warrantless video surveillance on his private property was unconstitutional and the videotape must be suppressed. We disagree and affirm.

Defendant owns and resides on thirty secluded acres of property in Ferrisburgh, Vermont. The property can be reached by a dirt road, and defendant's house is situated some 700 feet from the dirt road at the edge of the woods. There are no fences or signs prohibiting entry at the perimeter of the property.

In August of 1992, a Vermont State Police trooper received a tip from an informant that the informant had observed marijuana plants growing on defendant's property. On August 31, 1992, the trooper and a fellow officer responded to the report by entering defendant's unposted property and observing a number of marijuana plants growing in a wooded section of the property, about 150 feet from defendant's house. They also observed a foot path leading from defendant's house to the marijuana plants.

Three days later, the trooper returned and installed a recording video camera in the woods approximately 65 feet from the marijuana plants. The video camera was focused on the marijuana plants and a ten-foot portion of the path leading to the plants. The trooper attached an infrared motion sensor to the video camera. When the sensor detected human activity or other motion near the plants, it turned on the camera and recorder, which remained on for ten minutes. Five days later, the trooper returned to the property and retrieved the camera. The videotape showed defendant walking down the path and tending the marijuana plants in the garden. Based on all of the above information, the trooper applied for and received a search warrant for defendant's house and property. The subsequent search turned up five marijuana plants and various drug paraphernalia.

Defendant filed a motion to suppress the evidence seized, claiming that the warrantless video surveillance was unconstitutional under the Vermont Constitution[1] and that it tainted the search pursuant to the warrant. The trial court denied the motion, but recognized that the constitutionality of warrantless video surveillance had yet to be addressed by this Court. We now reach the constitutionality of the video surveillance.

Defendant's main argument is that he has a "reasonable expectation of privacy" such that he would not be videotaped on his land and that, under Chapter I, Article 11 of the Vermont Constitution, the police were required to obtain a search warrant before conducting video surveillance. In framing the issue, defendant does not dispute that the marijuana plants observed by the video camera were located

---

[1]Defendant has made no claim that the video surveillance offended the Fourth Amendment to the United States Constitution as interpreted by the United States Supreme Court and has apparently conceded that there is no federal constitutional violation. Defendant noted in his brief that *Oliver v. United States*, 466 U.S. 170, 178-79 (1984), allows the police, without a warrant, "to electrically eavesdrop on private activities in 'open fields' because this is not a constitutionally protected area."

outside the curtilage of his house and thus were in "open fields." Nor does he dispute that he took no steps to indicate to others that presence on his land outside the curtilage was prohibited.

We addressed the scope of Article 11 protection with respect to "open field" searches in *State v. Kirchoff*, 156 Vt. 1, 587 A.2d 988 (1991). In *Kirchoff*, the defendant was convicted of cultivating marijuana on a portion of his secluded property. He had put up several "no trespassing" signs at the foot of his driveway and had posted "no hunting and fishing" signs at the perimeter of his property. Nevertheless, the police ignored the signs, entered onto his property and discovered a marijuana patch about 100 yards from his house. We acknowledged in *Kirchoff* that the police's walk-on search would have been permissible under the federal constitution, as construed in *Oliver v. United States*, 466 U.S. 170, 179 (1984). See *Kirchoff*, 156 Vt. at 3, 587 A.2d at 990.

*Oliver* confirmed that the Fourth Amendment protects reasonable expectations of privacy, but held that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." 466 U.S. at 178. The Supreme Court reasoned that lands outside the curtilage of a dwelling "do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance." *Id.* at 179.

Nevertheless, in *Kirchoff*, we interpreted Article 11 as providing broader protection than the Fourth Amendment. We held that "a lawful possessor may claim privacy in 'open fields' under Article 11 of the Vermont Constitution where indicia would lead a reasonable person to conclude that the area is private." 156 Vt. at 10, 587 A.2d at 994. On the other hand, we did not extend Article 11 protection to "searches of lands where steps have not been taken to exclude the public." *Id.* By creating this standard, we hoped to protect the constitutional rights of those who have taken affirmative steps to obtain privacy in their lands, while not suppressing evidence obtained by the police that was "'knowingly exposed to the public.'" *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)). Specifically, we held that indicia such as fences, barriers and "no trespassing" signs reasonably indicate that the property is intended to be private and that strangers are not welcome. *Id.*

Under this interpretation of Article 11, we held that the warrantless walk-on search of the defendant's property was unconstitutional. See *id.* at 14, 587 A.2d at 997. The defendant clearly manifested both

an objective and subjective intent to exclude the public by posting "no trespassing" and "no hunting" signs around the perimeter of his property. See *id.* at 14, 587 A.2d at 996.

The controlling significance of steps to exclude the public is made clear by two other cases, where we held that no Article 11 violation had occurred.[2] In *State v. Chester*, 156 Vt. 638, 587 A.2d 1008 (1991) (mem.), decided four days after *Kirchoff*, the defendant had erected neither signs indicating entry to his land was prohibited nor barriers to entry. We held that the police had not violated Article 11 when they walked on the land and found a marijuana garden:

> *Kirchoff* holds that the State must have a warrant to enter land when it is apparent to a reasonable person that the owner or occupant intends to exclude the public. This standard is intended to define instances where a landowner's expectation of privacy in an area is reasonable or legitimate. . . .
>
> In this case, there were no barriers to indicate defendant's intent to exclude the public. *Where land is left unimproved and unbounded, the owner or occupant has not taken sufficient steps to exclude the public to trigger the protection of Chapter I, Article 11 of the Vermont Constitution.*

*Id.* at 638, 58⁻ A.2d at 1009 (citations omitted; emphasis supplied).

In *State v. Rogers*, 161 Vt. 236, 248, 638 A.2d 569, 577 (1993), we held that *Chester* applied despite the fact that the police officer had crossed through thick woods to reach a marijuana garden. We agreed with a similar decision of the Oregon Supreme Court, *State v. Dixson*, 766 P.2d 1015, 1024 (Or. 1988), that a "shield created by vegetation or topographical barriers" does not trigger Article 11 protections because the shield is natural and "fails to demonstrate the landowner's intent to exclude." *Rogers*, 161 Vt. at 248, 638 A.2d at 576.

The controlling significance of the place of observation to our Article 11 jurisprudence is made clear by three other post-*Kirchoff*

---

[2] Four other states — Montana, New York, Oregon and Washington — provide similar constitutional protection for "open fields" searches. Each of these states similarly requires the landowner or occupier to post or fence the property, that is, evince an intent to protect privacy, for state constitutional protections to apply. See *State v. Bullock*, 901 P.2d 61, 76 (Mont. 1995); *People v. Scott*, 593 N.E.2d 1328, 1338 (N.Y. 1992); *State v. Dixson*, 766 P.2d 1015, 1024 (Or. 1988); *State v. Johnson*, 879 P.2d 984, 993 (Wash. Ct. App. 1994).

decisions. In *State v. Blow*, 157 Vt. 513, 602 A.2d 552 (1991), the police sent an informant, wired with a transmitter, into the home of defendant to make a drug purchase. We held that "warrantless electronic participant monitoring conducted in a home offends the core values of Article 11" and suppressed the evidence obtained by the transmission. *Id.* at 519, 602 A.2d at 556.

On the same day, however, we decided *State v. Brooks*, 157 Vt. 490, 493-94, 601 A.2d 963, 964-65 (1991), in which we held that warrantless electronic monitoring conducted in a parking lot does not offend Article 11 because the speaker who is overheard does not have a reasonable expectation of privacy in words uttered to the informant outside the home.[3] In *State v. Bruyette*, 158 Vt. 21, 37, 604 A.2d 1270, 1278 (1992), a majority of this Court extended *Brooks* to a situation where the wired informant was the defendant's girlfriend and who spoke with him in an automobile.

The obvious import of these decisions is that this defendant had no reasonable expectation of privacy in the area in which he tended his marijuana garden because he took no steps to exclude the public. Thus, as we held in *Chester*, no Article 11 protections were triggered with respect to that area, and police were free to go onto his property and observe his activity. As a result, defendant has no greater protection against electronic surveillance on his unposted, open land than he would if such surveillance were conducted in a public place.

In reaching this conclusion, we reject defendant's argument that *Kirchoff* and its progeny are implied-consent rulings, that is, that they hold that an owner or occupier of land has no reasonable expectation of privacy only when he has impliedly consented to the observation involved. He then argues from that proposition that it would be improper to imply consent to video surveillance. We find nothing in *Kirchoff* to suggest that we used implied consent to determine where Article 11 protections begin. Indeed, it would bend implied consent beyond recognition to suggest that a landowner would impliedly consent to a trespass by law enforcement officers looking for evidence of the landowner's criminal conduct. Nor can *Brooks* be explained by a person's implied consent to talk with, and confess crimes to, a person who is wearing a transmitter so that law enforcement personnel can overhear the conversation. Even if an

---

[3] Similarly, the Oregon Supreme Court has ruled that use of a night vision system and video camera to observe persons in parked cars in a parking lot is not a search under the Oregon Constitution. See *State v. Wacker*, 856 P.2d 1029, 1036 (Or. 1993).

implied-consent rationale were to underlie these decisions, we would have no basis to say that we can imply a landowner's consent for direct observation of criminal conduct but not for video surveillance.

We are left, then, with the proposition that Article 11 protects against inappropriate use of electronic technology to observe a person's movements wherever they may occur. In arguing for this position, defendant notes that in *Rogers* we distinguished the situation where the officer's observation is aided by technology, see *Rogers*, 161 Vt. at 245, 638 A.2d at 574, and urges us to find that use of video technology alone creates an Article 11 search.

*Rogers* does not help defendant because the observation in that case was into a protected area — the curtilage surrounding the landowner's home. We agree that video surveillance of a protected area may trigger Article 11 protections although we need not consider those protections in this appeal. See *United States v. Mesa-Rincon*, 911 F.2d 1433, 1443 (10th Cir. 1990) (because of reasonable expectation of privacy in private business premises, law enforcement officers must obtain judicial approval for video surveillance therein, meeting modified standards of Title III of Omnibus Crime Control & Safe Streets Act of 1968); *State v. Bonnell*, 856 P.2d 1265, 1276 (Haw. 1993) (because employee break room is protected area, covert video surveillance of employees in room is search under Hawaii Constitution). There is no suggestion in *Rogers*, or any other case we can find, that use of technology to aid observation of activities in a public place raises Article 11 concerns where, as here, the person observed has taken no steps to avoid observation of his activities.

We need not try generally to define the circumstances that might trigger Article 11 regulation of video surveillance. Nor do we minimize the dangers of widespread use of video surveillance. In this case, however, video surveillance was used in a narrow set of circumstances, where the police had already determined that a crime was being committed, and only as a substitute for in-person surveillance.

Thus, this is not a case where video surveillance is aimed indiscriminately at public places and captures lawful activities of many citizens in the hope that it will deter crime or capture what crime might occur. See generally Comment, *Scowl Because You're on Candid Camera: Privacy and Video Surveillance*, 31 Val. U. L. Rev. 1079 (1997); J. M. Granholm, *Video Surveillance on Public Streets: The Constitutionality of Invisible Citizen Searches*, 64 U. Det. Mercy L. Rev. 687 (1987). Nor was it a situation where the video camera

enhanced the observation otherwise unavailable to the naked eye, see *State v. Young*, 867 P.2d 593, 599 (Wash. 1994) (employment of thermal imaging device was search, in part because it gathered information about defendant's home that could not be gathered by naked-eye observation); 1 W. LaFave, Search and Seizure § 2.2(c), (d) (3d ed. 1996), or recorded what a person would be unable to see because the person could not be at the observation point. See *Bonnell*, 856 P.2d at 1276.[4] We do not suggest that a warrant is required in all or any of these instances. We distinguish these only to emphasize the limited question before us.

The video camera recorded only what an officer standing in the same position would have observed with the naked eye. See *Vega-Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 181 (1st Cir. 1997) ("mere fact that the observation is accomplished by a video camera rather than the naked eye, and recorded on film rather than in . . . [observer's] memory, does not transmogrify a constitutionally innocent act into a constitutionally forbidden one"). Thus, it is a substitute for the traditional stake-out where a law enforcement officer conceals himself and waits to make the same observation as the video camera would make. As the State argues, the camera, if anything, was less intrusive on the privacy of the landowner because it had a narrow viewing field, was employed only when someone approached the marijuana garden and did not even record sounds. We do not see how Article 11 protects against the use of a technological device that accomplishes the same result as a lawful in-person stake-out, and nothing more. It certainly does not advance a free society for the judiciary to require the employment of more law enforcement personnel to properly enforce the criminal laws.

We recognize that a warrant is required in most cases where law enforcement officers engage in a search covered by Article 11, see *State v. Savva*, 159 Vt. 75, 85-86, 616 A.2d 774, 779-80 (1991), but one is not required where no Article 11 search is involved. Because we

---

[4] Recognizing that the judicial response to electronic video surveillance has not been consistent, the American Bar Association Criminal Justice Section has been working on a standard that would comprehensively cover when such surveillance is appropriate and establish procedural safeguards. The draft standard, which often suggests regulation beyond constitutional minimums, proposes for the video surveillance involved here only that a supervisory law enforcement official determine that the surveillance will not view a private activity or condition and is reasonably likely to achieve a legitimate law enforcement objective. See C. Slobogin, *Technologically-Assisted Physical Surveillance: The American Bar Association's Tentative Draft Standards*, 10 Harv. J.L. & Tech. 383, 458-59 (1997) (Draft Standard 2-6.3(c)).

hold that the video surveillance in this case did not trigger Article 11 protections, no warrant was required.

Although acknowledging that the police "acted reasonably in this particular case" and that the "surveillance techniques employed by police in this case were reasonably limited in time, scope and duration," 168 Vt. at 191, 720 A.2d at 876, the dissent would hold that the police acted unlawfully because they engaged in "covert surveillance" without a warrant. *Id.* at 193, 720 A.2d at 877. No court in this country has employed the dissent's reasoning to strike down warrantless surveillance, with or without video recording. Nor could law enforcement officers determine the boundary line between surveillance that requires a warrant and a "brief, warrantless observation" that does not. What the dissent seeks is a reevaluation of *Kirchoff, Chester* and *Rogers* to require law enforcement officers to seek a warrant in almost all cases involving open field searches to be sure they have not crossed the indeterminate line between observation and surveillance.

Moreover, the dissent argues that because indiscriminate video surveillance has the potential to "'eliminate personal privacy as understood in modern Western nations,'" 168 Vt. at 190, 720 A.2d at 875-76 (quoting *United States v. Torres,* 751 F.2d 875, 882 (7th Cir. 1984)), and bring about a society without privacy as described in George Orwell's novel *1984, all* video surveillance should require prior judicial authorization by way of a warrant. See *id.* at 193, 720 A.2d at 877. Apparently, under the dissent's rule, our trial courts would decide what investigatory methods could be employed by law enforcement officers, rather than leaving that determination to the executive branch officials charged with this responsibility.[5] Again, no court in this country has adopted such an extreme position. We reject it because we are required to decide *this case,* rather than to suggest a solution to every misuse of video technology we can conceive of.

On the facts of this case, there was no search covered by Article 11 of Chapter I of the Vermont Constitution. The Addison District Court acted correctly in refusing to suppress the videotape that showed defendant cultivating marijuana plants growing on his land.

*Affirmed.*

---

[5] The dissent has not stated what standard would be used in determining whether to issue a warrant. We note, however, there is no dispute in this case that the police had probable cause to believe that a crime was being committed. Thus, the Court's review must necessarily go to whether a particular form of investigation can be used with respect to the acknowledged crime.

**Johnson, J.,** dissenting.

> There was of course no way of knowing whether you were being watched at any given moment. . . . It was even conceivable that they watched everybody all the time. . . . You had to live — did live, from habit that became instinct — in the assumption that every sound you made was overheard, and, and, except in darkness, every movement scrutinized.

George Orwell, *1984* 4 (1949). George Orwell's bleak and chilling vision of post-modern civilization has not come to pass, at least not in this country. But allowing police agents to set up surreptitious, twenty-four-hour video surveillance of landowners on their own property without judicial oversight raises the specter of such a society. Indeed, the use of technological advances to enhance government surveillance techniques threatens to erode the expectations of privacy we take for granted in a free and open society. Today's decision undermines the lone bulwark against such erosion — Article 11's warrant requirement.

Few Vermonters would think that, merely by leaving their land unposted, they have left it open it to the Orwellian intrusions permitted under today's holding. The posting of "No Trespassing" signs or the erection of fences may be a prerequisite to bringing a successful trespass action against one who comes uninvited onto private property, or successfully challenging a brief walk-on search by police, but I do not understand our Constitution to require the placement of signs or barricades to prevent round-the-clock governmental surveillance by any and all means that modern technology can devise. Nothing in our prior case law interpreting Article 11 compels such a requirement.

Before discussing our jurisprudence, it is important to clarify that this appeal is not about whether law enforcement officials reasonably limited the scope of their covert surveillance activities in this case. Rather, the issues are whether police ever, under any circumstances, have to obtain a search warrant before seeking out or gathering criminal evidence on unposted private land outside the curtilage,[1] and, more particularly, whether police must obtain a warrant before

---

[1] The curtilage is an area outside the physical confines of a house that is afforded the same constitutional protection as the home itself because the activities in that area are directly and intimately connected with the home. See *State v. Rogers*, 161 Vt. 236, 241-42, 638 A.2d 569, 572 (1993).

conducting clandestine video surveillance on private property in search of criminal evidence.

The State argues that Article 11 does not protect unposted private land, and thus law enforcement officials may act with impunity in such areas. According to the State, police may secrete surveillance cameras in trees to record any and all human activity for an unlimited duration, or they may set up permanent manned observation posts, using sophisticated technology such as infrared observation devices, all without a warrant or probable cause. In the State's view, Article 11 is inapplicable *no matter how intrusive the manner or means of observation employed by police.* The Court accepts this startling argument with little reservation, holding that because Article 11's protection does not extend to open fields, there is no basis to preclude police from covertly videotaping citizens on their private property outside the curtilage of their homes in the hopes of obtaining evidence of criminal conduct. In so holding, the Court resurrects an outdated, formalistic analysis that rigidly focuses on mapping out property worthy of constitutional protection while ignoring modern search-and-seizure law, which examines expectations of privacy and societal interests.

Because both Article 11 and the Fourth Amendment to the United States Constitution protect our right to be free of unreasonable searches and seizures by the government, our Article 11 jurisprudence necessarily has been intertwined with federal interpretations of the Fourth Amendment. Nevertheless, we have explicitly rejected Fourth Amendment jurisprudence in the area of open fields. In *State v. Kirchoff*, we refused to follow the bright-line rule set forth in *Oliver v. United States*, 466 U.S. 170, 179 (1984), declaring that a person may never legitimately demand privacy in open fields. See 156 Vt. 1, 10, 587 A.2d 988, 994 (1991) (bright-line test of *Oliver* "simply fails to do justice to values underlying Article 11"). Indeed, we labeled *Oliver*'s per se rule that society is not prepared *under any circumstances* to recognize as reasonable an expectation of privacy in lands outside the curtilage "a bold and unsupported pronouncement" that cannot be squared with Article 11. *Id.* at 9, 587 A.2d at 994. We emphasized that our duty is to discover and protect the core value of privacy that gave life to Article 11 and that was discarded by *Oliver*. See *id.* at 7, 587 A.2d at 992. Further, we recognized a presumption that government searches of a person's land implicate Article 11, and thus that the State had the burden to demonstrate that its conduct did not violate Article 11. See *id.* at 13, 587 A.2d at 996.

At the same time, the *Kirchoff* decision embraced the United States Supreme Court's decision in *Katz v. United States*, 389 U.S. 347 (1967). Before *Katz*, the Supreme Court had held that a physical trespass into a constitutionally protected area was necessary for a "search" to have occurred within the meaning of the Fourth Amendment. See *Olmstead v. United States*, 277 U.S. 438, 466 (1928) (wiretapping is not "search" within meaning of Fourth Amendment because telephone messages are not material things and there is no actual physical invasion of constitutionally protected area); *Hester v. United States*, 265 U.S. 57, 59 (1924) (special protection accorded by Fourth Amendment to people in their persons, houses, papers, and effects does not extend to open fields). But the Court abandoned that notion in *Katz*, a case in which agents of the Federal Bureau of Investigation had bugged a suspect's conversations by placing a listening device on the outside of a public telephone booth, an area that historically had not been considered constitutionally protected from government intrusion. The Court stated that "the correct solution of Fourth Amendment problems is not necessarily promoted by incantation of the phrase 'constitutionally protected area,'" which deflects attention from the fact that "the Fourth Amendment protects people, not places." *Katz*, 389 U.S. at 350, 351; see *State v. Zaccaro*, 154 Vt. 83, 90, 574 A.2d 1256, 1261 (1990) (like Fourth Amendment, Article 11 protects people, not places). According to the Court, by electronically listening to and recording the suspect's words, the government violated the privacy upon which he justifiably relied. See *Katz*, 389 U.S. at 353.

After *Katz*, the concept of constitutionally protected areas no longer served as a talismanic solution to every Fourth Amendment problem. See 1 W. LaFave, Search and Seizure § 2.4(a), at 524 (3d ed. 1996). Instead, courts had to examine the nature of the government's activities, balance societal interests, and then determine whether allowing the challenged government conduct to go unregulated would unacceptably diminish the level of freedom and privacy expected in a free and open society. This is the view of *Katz* that this Court accepted in *Kirchoff* and reaffirmed in *State v. Morris*, 165 Vt. 111, 115-16, 680 A.2d 90, 94 (1996) (Vermonters have reasonable expectation of privacy in contents of secured garbage bags left at curbside for collection and disposal).

The facts in *Kirchoff* did not require this Court to address the issues involved in the instant case. In *Kirchoff*, police officers acting on a tip walked onto defendant's posted land, confirmed that mari-

juana plants were growing on the property, and then obtained a warrant. See 156 Vt. at 3, 587 A.2d at 990; see also *State v. Rogers*, 161 Vt. 236, 239, 638 A.2d 569, 571 (1993) (upholding search in which police walked onto private property outside curtilage, observed recently harvested marijuana patch within or near curtilage, and obtained search warrant). The case did not involve surveillance at all, as that term is commonly understood, let alone covert video surveillance over a period of days. We held that landowners may claim privacy in open fields by posting their land or otherwise demonstrating an intent to exclude others. *Kirchoff*, 156 Vt. at 10, 587 A.2d at 994. We did not suggest, however, that the general principles enunciated in the case — that Article 11's protection extends beyond the curtilage of the home, and that government searches of a person's land presumptively implicate Article 11 — were limited to the facts of the case.

To the contrary, we suggested in *Kirchoff* that the nature of the surveillance activities conducted by police is a relevant, indeed critical, factor in determining whether Article 11 is implicated. In construing the term "reasonable expectation of privacy" — the benchmark for determining whether a "search" has occurred — we stated that because "'people will confine their 'intimate activities' to narrower areas as 'government interference or surveillance' grows more intrusive and pervasive . . . constitutional rights should not succumb to waning expectations or fluctuations in the degree of government intrusion 'society' is willing to condone." *Id.* at 8, 587 A.2d at 993. Moreover, we emphasized that our constitutional rights do not diminish with technological advances that enable the government to further encroach on our privacy. See *id.* at 12-13, 587 A.2d at 996; *California v. Ciraolo*, 476 U.S. 207, 218 (1986) (Powell, J., dissenting) (standard that defines Fourth Amendment search by reference to whether police have physically invaded constitutionally protected area provides no real protection against surveillance techniques made possible through technology); cf. *Rogers*, 161 Vt. at 245, 638 A.2d at 574 (state trooper's observation of marijuana patch within curtilage from vantage point outside curtilage did not violate Fourth Amendment absent use of technology to aid observation).

Today, the Court ignores the true import of *Kirchoff* and revives the discredited "constitutionally protected area" analysis by declaring that all unposted private land in Vermont lying outside the curtilage of the home is beyond the protection of Article 11 and thus subject, without judicial oversight, to the most intrusive forms of surveillance of which modern technology is capable.

Ironically, the Court refers to the potential dangers of warrantless covert video surveillance of public places, a view I share, but then refuses to acknowledge that persons have legitimate expectations of privacy from such intrusive surveillance on their own property. I believe that ownership and possession, even with respect to unposted land outside the curtilage of the home, provide persons with certain expectations of privacy. See *United States v. Taketa*, 923 F.2d 665, 677 (9th Cir. 1991) (property interest is one of several factors courts consider in assessing expectations of privacy); *State v. Thomas*, 642 N.E.2d 240, 244 (Ind. Ct. App. 1994) (ownership and possession, while not determinative, remain relevant factors in assessing whether one has expectation of privacy). Ownership of real estate generally gives one the right to exclusive use of the property, as evidenced by civil and criminal laws against trespass. See 12 V.S.A. § 4911; 13 V.S.A. § 3705. Surely, regardless of whether we display "No Trespassing" signs or erect barriers, the expectation of privacy we have with respect to our own land is not so low as to give the government free reign to conduct any type of surveillance, no matter how intrusive in nature, without judicial oversight.

Apparently, the Court believes that because hikers or hunters may pass through unposted private land, the owners of such land cannot reasonably expect privacy from clandestine government surveillance of their activities on their property. We have recently rejected similar reasoning in a different context. See *Morris*, 165 Vt. at 119, 680 A.2d at 96 (notwithstanding the possibility that garbage will be tampered with by scavengers and snoops, people reasonably expect that their trash will be commingled with other garbage without being intercepted and examined by police). Just as the disposal of trash for curbside pickup cannot be the basis for concluding that persons no longer have a justified expectation of privacy in the contents of the trash, see *id.* at 118, 680 A.2d at 95, leaving one's private land unposted for the benefit of others' recreational pursuits cannot be the basis for concluding that one has waived all right to privacy from intrusive government surveillance on that land, see *United States v. Lace*, 669 F.2d 46, 55 (2d Cir. 1982) (Newman, J., concurring) ("open fields" on private property are not open for any surveillance police officers choose to conduct, unrestricted as to duration, constancy of observation, location observed, or means of enhanced viewing); *People v. Cook*, 710 P.2d 299, 304 (Cal. 1985) (fact that persons discarding trash or conducting activities in public telephone booths, hospital rooms, or hotel rooms might expect police or others to enter

area or see or hear activities within area does not necessarily preclude reasonable claims of privacy from intensive police spying); M. Gutterman, *A Formulation of the Value and Means Models of the Fourth Amendment in the Age of Technologically Enhanced Surveillance*, 39 Syracuse L. Rev. 647, 682-83 (1988) (citizens may expect casual public observation without consenting to police surveillance).

Someone sunbathing in the nude in a secluded area on private property may have no basis for complaint if observed by a passerby, but it is not reasonable to assume that that person would expect to be surreptitiously videotaped by government agents. See *Lace*, 669 F.2d at 57 (Newman, J., concurring). Article 11 does not require us to remain inside behind drawn shades to feel assured of being free from around-the-clock government surveillance. See *Cook*, 710 P.2d at 305 (if Fourth Amendment permitted government inspection by any and all means that persons failed to forestall, our society would be transformed into garrison state); Gutterman, *supra*, at 686-87 ("Surely, one has reason to expect that he need not hide himself in a soundproof home, with the curtains drawn, and remain quiet to enjoy the precious liberties derived from the Constitution.").

I agree that the nature of the area in which a police search was conducted remains a factor in determining whether Article 11 is implicated, and that one generally has a reduced expectation of privacy as to unposted private property outside the curtilage of the home. I do not agree, however, that the location of the investigating officer or the search is necessarily the dispositive factor, precluding any consideration of the nature or manner of the search. See *Vega-Rodriquez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 180 (1st Cir. 1997) (precise extent of expectation of privacy often turns on nature of intended intrusion); *United States v. Domitrovich*, 852 F. Supp. 1460, 1473 (E.D. Wash. 1994), *aff'd*, 57 F.3d 1078 (9th Cir. 1995) (in determining whether expectation of privacy is reasonable, no single factor, including place, is dispositive); *Cook*, 710 P.2d at 303 ("Though location is no longer the *sine qua non* of search-and-seizure analysis, it remains relevant under the *Katz* test."); *State v. Kender*, 588 P.2d 447, 450 (Haw. 1979) (in examining reasonable expectation of privacy, a number of factors, including type and character of police conduct, must be considered; relying solely on officer's position would resurrect former emphasis on whether physical trespass had occurred).

In determining the reach of Article 11, we strive to balance society's interests in achieving effective law enforcement while protecting persons from unreasonable government intrusions. Because

landowners who choose not to post their lands may risk, even expect, that an occasional passerby will observe activities on their property that the landowner would otherwise like to keep private, we have allowed police to conduct brief, warrantless observations on private land outside the curtilage to verify suspicion of criminal wrongdoing. But there is a qualitative difference between walking on to private property to verify a tip and setting up intensive covert surveillance there. At some point, even on private property outside the curtilage, the nature of police activities becomes so intrusive that it violates reasonable expectations of privacy. I believe that that point is reached when police decide to surreptitiously videotape persons on their private property.

The Court minimizes the intrusiveness of the videotaping in this case, noting that police could have accomplished the same objective by means of an around-the-clock traditional stake-out, which would have been even more intrusive. This is a moot point, given the Court's holding that Article 11 offers no protection from police activities on private property outside the curtilage. But even if it were not, for several reasons I do not find it persuasive.

First, I do not necessarily agree with the Court's presumption that police would not need a warrant to conduct a twenty-four-hour traditional stakeout on private property. See R. Power, *Technology and the Fourth Amendment: A Proposed Formulation for Visual Searches*, 80 J. Crim. L. & Criminology 1, 68-69 (1989) (warrant should not be required for mere observation, which constitutes useful and discrete method of verifying tip or otherwise checking suspicious behavior to determine whether more intrusive search would be appropriate; however, warrant should be required where investigatory stage evolves into collection of evidence through surveillance). If sufficiently intrusive, covert surveillance activities, even when conducted without electronic enhancement on land outside the curtilage, may invade reasonable expectations of privacy and thus require a warrant. Certainly, paramilitary-like operations on private property invade reasonable expectations of privacy. See *Lace*, 669 F.2d at 53 (Newman, J., concurring) (disagreeing with court's view that continuous, warrantless, paramilitary surveillance activities on rural Vermont farm over three-week period was not invasion of privacy protected by Fourth Amendment).

Second, it is much easier and cheaper to maintain covert surveillance by secreting a small video camera in a tree than by rotating shifts of police officers. People know that limited resources make it

highly unlikely that police would be willing or able to watch them twenty-four hours a day. The Court states that it does not advance the goals of a free society for the judiciary to require the employment of more law enforcement personnel to enforce the criminal laws. But, in my view, by far the more important point is that it does not advance the goals of a free society to allow the government to spy on its citizens on their private property, without probable cause or a warrant.

Third, video surveillance *can* be more intrusive than observation by the naked eye. Cf. *State v. Blow*, 157 Vt. 513, 520, 602 A.2d 552, 556 (1991) (citing *State v. Zaccaro*, 154 Vt. at 85-86, 574 A.2d at 1258, to underscore distinction between evidence based on electronic recording and testimony of same event based only on senses and memory). As Judge Posner recognized, covert video surveillance is exceedingly intrusive, inherently indiscriminate, and so susceptible to abuse that it has the potential to "eliminate personal privacy as understood in modern Western nations." *United States v. Torres*, 751 F.2d 875, 882 (7th Cir. 1984). Other courts addressing the issue agree. See *United States v. Mesa-Rincon*, 911 F.2d 1433, 1443 (10th Cir. 1990) (because covert video surveillance is extraordinarily intrusive method of searching, there must be higher showing of necessity to justify it); *State v. Bonnell*, 856 P.2d 1265, 1277 (Haw. 1993) (agreeing with Judge Posner in *Torres* that video surveillance provokes immediate visceral reaction and raises specter of Orwellian state); *Thomas*, 642 N.E.2d at 245 (video surveillance has been recognized as one of most intrusive forms of searches performed by government, regardless of type of premises searched); *People v. Teicher*, 422 N.E.2d 506, 513 (N.Y. 1981) (video surveillance is inherently highly intrusive).

Indeed, courts and commentators have concluded that because videotaping captures a continuous, inescapable image of a person's every movement, which creates a record for minute inspection by others at a later time, the unblinking eye of the video camera is even more intrusive than wiretapping or bugging. See *Torres*, 751 F.2d at 885 (video surveillance is even more invasive of privacy than wiretapping and bugging, just as strip search is more invasive than pat-down search); *In re Application of Order Authorizing Interception of Oral Communications & Videotape Surveillance*, 513 F. Supp. 421, 423 (D. Mass. 1980) (most observers would regard video surveillance, standing alone, as even more intrusive than interception of oral communications); *Ricks v. State*, 537 A.2d 612, 616 (Md. 1988) ("It cannot be doubted . . . that video surveillance is more intrusive than audio

surveillance . . . ."). Covert video surveillance is certainly more intrusive than electronic participant monitoring of face-to-face conversations, where the targeted person, by communicating to another, has less reason to expect that the communication will remain private. See Comment, *Electronic Visual Surveillance and the Fourth Amendment: The Arrival of Big Brother?*, 3 Hastings Const. L.Q. 261, 294 (1976); cf. *State v. Brooks*, 157 Vt. 490, 494, 601 A.2d 963, 965 (1991) (allowing warrantless electronic participant monitoring of face-to-face conversations in public parking lot). Acknowledging this, most courts have permitted government video surveillance only when conducted under the rigorous requirements established for *audio* electronic surveillance in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2521,[2] which was enacted following the decision in *Katz*. E.g., *United States v. Biasucci*, 786 F.2d 504, 510 (2d Cir. 1986) (Title III standards, together with more general constitutional requirements, form sufficient outline of showing government must make before obtaining warrant for video surveillance); *Torres*, 751 F.2d at 885 (Title III provides measure of government's constitutional obligation in seeking warrant for video surveillance); see Power, *supra*, at 106 (citing cases, and noting that Congress did not regulate video surveillance under Title III in 1968 because technology was not sufficiently advanced at that time for law enforcement officials to use technique with any degree of success).

Here, the Court avoids confronting the intrusive nature of video surveillance by pointing out that the police acted reasonably in this particular case. I agree that the surveillance techniques employed by police in this case were reasonably limited in time, scope, and duration. Nevertheless, the Court's reliance on these self-imposed and nonbinding limitations is inconsistent with its own analysis and the purposes behind the warrant requirement. The Court holds today that no Article 11 search was involved because Article 11 does not apply to unposted private property outside the curtilage. Thus, under the Court's own analysis, the extent of the intrusiveness of the search

[2] Under Title III, law enforcement officials may not conduct audio electronic surveillance of a person unless they request a search warrant, and a judicial officer determines that (1) there is probable cause to conclude that the person committed one of the offenses enumerated in Title III, (2) communications concerning the offense will be obtained through interception, (3) the facilities from which the communications are to be intercepted are being used in connection with the commission of the offense, and (4) normal investigative techniques have failed, appear unlikely to succeed, or would be too dangerous. See 18 U.S.C. § 2518(3). Title III also imposes severe restrictions on the scope of warrants permitting the use of electronic surveillance. See *id.* § 2518(4).

is simply irrelevant. If, on the other hand, the Court means to imply that the intrusiveness of police conduct is a factor to be considered in determining whether a search occurred, then unposted private lands are not outside the reach of Article 11. If that is the case, in each instance law enforcement officers would have to determine whether their video surveillance on private property was sufficiently intrusive to require obtaining a warrant before proceeding. This is the very type of uncertainty that the Court warns would result from requiring police officers to distinguish between observation and surveillance.

But the most disturbing aspect of the Court's reliance on the limited nature of the surveillance in this case is its implicit misunderstanding of the warrant requirement. The warrant requirement is not a means for hindsight review of the constitutionality of police conduct toward individuals eventually arrested and prosecuted for having violated the law. Article 11 requires judicial oversight *before* would-be invasions of privacy occur; after-the-fact challenges by criminal defendants do not fully serve Article 11's purpose of protecting everyone, particularly law-abiding citizens. See *State v. Savva*, 159 Vt. 75, 86, 616 A.2d 774, 780 (1991). The warrant requirement assures that neutral and detached judicial officers, rather than police officers whose primary duty is to apprehend criminal suspects, will evaluate the reasonableness of proposed searches. See *id.* Involving a judicial officer before searches occur not only reduces the chances that hindsight will color the evaluation of the reasonableness of those searches, but also prevents ill-considered searches against law-abiding citizens. It is these latter searches, not the fruitful ones, that do not reach criminal court and thus can be prevented only by our adherence to Article 11's warrant requirement. See *id.* at 86-87, 616 A.2d at 780. Even if the judicial officer agrees with the police that probable cause exists for a given search, the fact that the decision was made by a neutral officer reassures the public that an orderly process of law has been respected and followed. See *id.* at 87, 616 A.2d at 780.

The Court's hindsight approach in this case ignores this reasoning, which has long been a critical component of both federal and Vermont search-and-seizure jurisprudence. In *Katz*, the Supreme Court found unavailing the government's argument, similar to the State's argument in the instant case, that the bugging it engaged in was reasonably limited in scope and duration. While acknowledging that the federal agents acted with restraint and that a magistrate could have constitutionally authorized their reasonably limited search, the Court nonetheless refused to overlook its long-held position that,

except for specifically established inapplicable exceptions, warrant-less searches are per se unreasonable. See *Katz*, 389 U.S. at 357. Until today, "[w]e have taken this 'basic constitutional rule' as our own." *Savva*, 159 Vt. at 86, 616 A.2d at 789 (quoting *State v. Meunier*, 137 Vt. 586, 588, 409 A.2d 583, 584 (1979)).

Given the highly intrusive nature of covert video surveillance and its rising popularity among law enforcement officials as an evidence-gathering technique, see Comment, *Let's Go to the Videotape: The Second Circuit Sanctions Covert Video Surveillance of Domestic Criminals*, 53 Brook. L. Rev. 469, 471 (1987), I would hold that when police seek to gather evidence of criminal activity on private property through the use of covert video surveillance, they must first obtain a search warrant restricting the time, duration, manner, and scope of the search. See Power, *supra*, at 111 (electronic surveillance tech-niques are sufficiently sophisticated to mandate judicial supervision in all cases). Further, as a condition to obtaining a warrant, I would require police to demonstrate to a judicial officer that other means of evidence-gathering are unfeasible. Anything short of this would fail to serve Article 11's "purpose of protecting the rights of everyone — law-abiding as well as criminal — by involving judicial oversight before would-be invasions of privacy." *Savva*, 159 Vt. at 86, 616 A.2d at 780.

The Court characterizes this view as extreme, but merely labeling it as such does not make it so. I dare say that most Vermonters would diverge from the Court if asked which of the following two positions is the extreme one: the Court's holding that our Constitution offers no protection from covert electronic surveillance by the government of citizens on their private property outside the curtilage of their homes, or the view of Justice Morse and myself that police must obtain a warrant from a neutral judicial officer before conducting such activ-ities. I arrive at my view with the understanding that this Court must balance society's interest in privacy and freedom from governmental intrusions with society's equally valid interest in effective law en-forcement. I do not believe that requiring warrants for clandestine videotaping on private property would hamper police in their effort to investigate suspected criminal activity. Indeed, as I stated above, it is clear to me that the police activities in this case could have been conducted pursuant to a lawful warrant.

To be sure, privacy as a constitutional precept is an elusive concept. Nevertheless, all of us intuitively know that privacy is necessary not only to preserve freedom in a democratic society, but also to enhance

our mental, physical, and spiritual well-being. See Gutterman, *supra*, at 681. Privacy plays an important role in developing our ability to be creative and spontaneous and to form trusting bonds with others. *Id.* Knowing that our private activities might be under surveillance destroys our sense of security, freedom, and trust. I fear that today's decision can only undermine the sense of security and trust that is the hallmark of a free and open society.

I am authorized to state that Justice Morse joins in this dissent.