## State of Vermont v. John E. Geraw

[795 A.2d 1219]

No. 00-459

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed March 15, 2002

---

*Lauren Bowerman*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellant.

*E.M. Allen* of *Stetler Allen & Kampmann*, Burlington, for Defendant-Appellee.

**Johnson, J.** The question presented is whether Vermont citizens must accept the risk that police interviews in the privacy of their home are being secretly recorded without the protection of a judicially authorized warrant. We conclude that Chapter I, Article 11 of the Vermont Constitution prohibits such secret recording. Accordingly, we affirm the order of the Chittenden District Court granting defendant's motion to suppress.

The material facts are few and undisputed. On April 17, 2000, two police detectives interviewed defendant at his residence in Essex Junction. The detectives were investigating an allegation that defendant had engaged in sexual acts with a foster child. The officers identified themselves, and defendant invited them into his residence. They sat down at defendant's kitchen table, where the officers interviewed defendant about his relationship with the minor. Unbeknownst to defendant, the officers secretly tape recorded the conversation.

Defendant was later charged with one count of sexual assault of a minor, in violation of 13 V.S.A. § 3252(b)(1). He moved to suppress the audio recording of the interview, alleging that it was unlawfully obtained without a warrant, in violation of Chapter I, Article 11 of the Vermont Constitution.[1] Following a hearing, the trial court issued a written decision and order, granting the motion. The court concluded that defendant enjoyed a reasonable expectation that a conversation in the privacy of his home would not be secretly recorded, and therefore that the recording violated his fundamental right to privacy

---

[1] That provision states: "That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted."

under Article 11 and must be suppressed. The trial court subsequently granted, and this Court accepted, the State's request for an interlocutory appeal.

In reviewing the trial court's ruling, we benefit from a series of decisions over the last two decades dealing with the requisite standards and permissible scope of searches and seizures under Article 11. We begin with the fundamental proposition that, as stated in *State v. Jewett*, 148 Vt. 324, 328, 532 A.2d 958, 960 (1986), "[t]he circumstances under which warrantless searches or seizures are permitted . . . must be jealously and carefully drawn." (internal quotation marks omitted). The warrant requirement in our Constitution reflects a deeply-rooted historical judgment that the decision to invade the privacy of an individual's home or possessions should normally be made by a neutral magistrate, not by the agent of the search itself. See *State v. Savva*, 159 Vt. 75, 86, 616 A.2d 774, 780-81 (1991). Judicial review operates as a potent and immutable check on the power of the executive branch, immune from the shifting political pressures or perceived exigencies of the time. *Id.* at 87, 616 A.2d at 780-81.

That said, we have also consistently held that Article 11 protects only those areas or activities that a reasonable person would conclude are intended to be private. See *State v. Costin*, 168 Vt. 175, 177, 720 A.2d 866, 868 (1998); *State v. Kirchoff*, 156 Vt. 1, 10, 587 A.2d 988, 994 (1991); *State v. Blow*, 157 Vt. 513, 517, 602 A.2d 552, 555 (1991). "[A] person cannot rely on Article 11 to protect areas or activities that have been willingly exposed to the public." *Kirchoff*, 156 Vt. at 7, 587 A.2d at 994. Thus, we have held that the State must have a warrant to enter open fields where indicia, such as fences and signs, would lead a reasonable person to conclude that the area is private, see *id.*, but that Article 11 does not protect such areas when the owner or occupant has not taken sufficient steps to exclude the public. See *State v. Chester*, 156 Vt. 638, 638, 587 A.2d 1008, 1009 (1991) (mem.). This distinction was reaffirmed in *Costin*, where a majority of the Court held that Article 11 does not prohibit the use of a warrantless video surveillance camera located in a field where an in-person police stake-out would not otherwise be excluded. 168 Vt. at 180-82, 720 A.2d at 868-71.

Two additional decisions — *Blow*, 157 Vt. 513, 602 A.2d 552, and *State v. Brooks*, 157 Vt. 490, 601 A.2d 963 (1991) — are especially significant for our purposes here, as both underscore the significance

of the home as a repository of heightened privacy expectations. In *Blow*, we held that Article 11 prohibited the police from monitoring and recording a conversation with a confidential informant in the defendant's home without a warrant, noting that such activity "conducted in a home offends the core values of Article 11." 157 Vt. at 519, 602 A.2d at 556. On the same day, we held in *Brooks* that the warrantless transmittal and recording of a conversation with a confidential police agent in a parking lot did not offend Article 11 because the defendant did not have the same expectation of privacy in words uttered to the informant outside his home. 157 Vt. at 493-94, 601 A.2d at 965; see also *State v. Bruyette*, 158 Vt. 21, 37, 604 A.2d 1270, 1278 (1992) (Dooley, J., concurring) (suggesting that secret monitoring of conversation between defendant and his girlfriend in parked car was outside protection of Article 11).[2]

We have, to be sure, disagreed at times about the degree of emphasis to be placed on the location of the search and seizure, to the exclusion of other considerations, such as advanced technologies that may alter or intensify the nature of the intrusion. See, e.g., *Brooks*, 157 Vt. at 494, 601 A.2d at 965 (Morse, J., dissenting) (arguing that intrusive "nature of the surveillance" as much as the location may trigger Article 11 protection); *Costin*, 168 Vt. at 188-90, 720 A.2d at 874 (Johnson, J., dissenting) (arguing that even unposted open field may warrant Article 11 protection from intensive round-the-clock surveillance by hidden video camera); see generally Note, *The Lack of Privacy in Vermont*, 24 Vt. L. Rev. 199, 218-25 (1999) (noting tensions between geographic and balancing approaches in the

---

[2] As we acknowledged in *Brooks* and *Blow*, the Fourth Amendment to the United States Constitution — as interpreted by the high court in *United States v. White*, 401 U.S. 745, 751 (1971) — does not prohibit the warrantless use of informants equipped with concealed devices to record conversations with unknowing suspects. Many state courts have followed *White*. See *Brooks*, 157 Vt. at 492 n.2, 601 A.2d at 964 n.2 (listing states that have followed *White*). Several others, however, have declined to follow *White*, including two which we cited in our earlier decisions, *State v. Glass*, 583 P.2d 872, 880 (Alaska 1978), and *Commonwealth v. Blood*, 507 N.E.2d 1029, 1031-39 (Mass. 1987). More recently, Pennsylvania's high court also construed its state constitution to prohibit the police from using a confidential informant to surreptitiously record conversations in a defendant's home without a warrant. See *Commonwealth v. Brion*, 652 A.2d 287, 289 (Pa. 1994); see generally C. Bast, *What's Bugging You? Inconsistencies and Irrationalities of the Law of Eavesdropping*, 47 DePaul L. Rev. 837, 871-78 (1998) (collecting state constitutional decisions dealing with surreptitious police monitoring and recording); M. Dubis, *The Consensual Electronic Surveillance Experiment: State Courts React to United States v. White*, 47 Vand. L. Rev. 857, 858-87 (1994) (collecting and analyzing state court decisions after *White*).

Court's Article 11 jurisprudence). We have consistently agreed, however, that the home represents a unique historical category with "special expectations of privacy" warranting the strongest constitutional protection from warrantless searches and seizures. *State v. Morris*, 165 Vt. 111, 133, 680 A.2d 90, 105 (1996) (Dooley, J., dissenting).

As noted, *Blow* is especially significant in this regard, since the only real distinction here is that the secret recording was accomplished in defendant's home by a known police officer rather than by a confidential police informant.[3] A careful reading of *Blow* and the cases discussed above, however, renders this a distinction devoid of any meaningful difference; for the heart of our holding in *Blow* was a recognition of the "deeply-rooted legal and societal principle that the coveted privacy of the home should be especially protected." *Blow*, 157 Vt. at 518, 602 A.2d at 555. This heightened expectation of privacy rendered it objectively reasonable to expect that conversations in the privacy of one's home would not be surreptitiously invaded by warrantless transmission or recording. "[W]arrantless electronic participant monitoring conducted in a home," we held, "offends the core values of Article 11." *Id.* at 519, 602 A.2d at 555.

While our holding would not appear to admit of any exceptions based on the particular identity of the secret recorder, properly understood it is not the breadth of our holding in *Blow* but rather its underlying reasoning that dissolves any constitutionally significant distinction between that case and this. This is readily discerned from two of the principal cases on which we relied, *Commonwealth v. Blood*, 507 N.E.2d 1029 (Mass. 1987), and *State v. Glass*, 583 P.2d 872 (Alaska 1978). In both cases, the high courts of Massachusetts and Alaska held, respectively, that the electronic recording of a conversation by a confidential informant in the defendant's home violated the defendant's right to privacy under the state constitution. See *Blood*, 507 N.E.2d at 1034 (holding that it was "objectively reasonable to expect that conversational interchange in a private home will not be invaded surreptitiously by warrantless electronic transmission or recording"); *Glass*, 583 P.2d at 880 (construing state

---

[3] The State does not assign, nor do we discern, any significance in the fact that the secret tape recording in *Blow* was accomplished by means of a hidden wire that transmitted the conversation to a third police agent who recorded the conversation, while here it was accomplished by means of a secret tape recorder in the possession of the detectives.

constitution to hold that "the expectation that one's conversations will not be secretly recorded or broadcast should be recognized as reasonable"); see also *Commonwealth v. Brion*, 652 A.2d 287, 289 (Pa. 1994) (holding "that an individual can reasonably expect that his right to privacy will not be violated in his home through the use of any electronic surveillance").

Both cases recognized the risk that confidences disclosed to another person in the privacy and security of one's home may be repeated to others, or even later disclosed in court. Yet both fundamentally rejected the proposition that there was no difference between talking to another person who later repeats what is said, and talking to someone who electronically records one's every word and phrase. As eloquently summarized in *Blood*:

> We think it a constitutional imperative to recognize that "the differences between talking to a person enswathed in electronic equipment and one who is not are very real, and they cannot be reduced to insignificance by verbal legerdemain. All of us discuss topics and use expressions with one person that we would not undertake with another and that we would never broadcast to a crowd. Few of us would ever speak freely if we knew that all our words were being captured by machines for later release before an unknown and potentially hostile audience. No one talks to a recorder as he talks to a person."

507 N.E.2d at 1036 (quoting *Holmes v. Burr*, 486 F.2d 55, 72 (9th Cir. 1973) (Hufstedler, J., dissenting)); see also *Glass*, 583 P.2d at 878 (noting that invasive impact of secret recording in the home presents an "additional risk of an entirely different character" than the possibility of mere participant disclosure, which is mediated by such attendant circumstances as credibility, memory, and selectivity).

The Massachusetts court also relied on Justice Harlan's compelling dissent in *United States v. White*, 401 U.S. 745 (1971) (the decision we declined to follow in *Blow*), in which he eviscerated the argument "that it is irrelevant whether secrets are revealed by the mere tattletale or the transistor." *Id.* at 787 (Harlan, J., dissenting). Justice Harlan reasoned that the scope of constitutional protection must reflect "the impact of a practice on the *sense of security* that is the true concern of the . . . protection of privacy." *Id.* at 788 n.24 (emphasis added). Analyzed in this light, warrantless monitoring and

recording "undermine[s] that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in a free society." *Id.* at 787. While interposing a warrant requirement between law enforcement officers engaged in such practices and the general public does not lessen the intrusion, it does — at least — ensure that the surveillance has been found to be reasonably necessary by a "prior independent determination of a neutral magistrate." *Id.* at 783.[4]

Thus understood, our holding in *Blow* cannot be reconciled with the State's argument that Article 11 permits a known police officer to secretly record a conversation in an individual's home without judicial authorization because the "expectation of privacy" is different. From the standpoint of the citizen secure in the privacy of his or her home, nothing changes merely because the party spoken to is a police officer rather than the officer's secret alter ego. Any Vermonter who sits around the kitchen table conversing — as defendant did here — has a reasonable right to expect that he or she is not being secretly monitored or recorded. Our "sense of security" in face-to-face conversations inside our homes extends at least this far.

Of course, most people will be more wary when speaking with a police officer than a friend, and should reasonably expect that the conversation will be carefully noted and subsequently repeated. This is a far different expectation, however, from knowingly exposing every word and phrase one speaks, every inflection or laugh or aside

---

[4] The dissent relies on *Lopez v. United States*, 373 U.S. 427, 439 (1963), for the proposition that admitting a secretly recorded conversation with the police represents nothing more than "the most reliable evidence" of the conversation. The dissent fails to note that Justice Harlan, who authored *Lopez*, expressly disavowed this aspect of its reasoning in *White*. While acknowledging that there might be some difference between third-party eavesdropping, as occurred in *White*, and participant tape-recording, as in *Lopez*, Justice Harlan nevertheless observed:

> While the continuing vitality of *Lopez* is not drawn directly into question by this case, candor compels me to acknowledge that the views expressed in this opinion [*White*] may impinge upon that part of the reasoning in *Lopez* which suggested that a suspect has no right to anticipate unreliable testimony. I am now persuaded that such an approach misconceives the basic issue, focusing, as it does, on the interests of a particular individual rather than evaluating the impact of a practice on the *sense of security that is the true concern of the Fourth Amendment's protection of privacy.*

*White*, 401 U.S. at 788 n.24 (Harlan, J., dissenting) (emphasis added).

one utters, to the scrutiny of the world at large. Clearly the detectives who interviewed defendant well understood that his expectations and, hence, his very words might be different if he knew that he was being recorded. Otherwise, they would have not have acted surreptitiously.

The dissenting opinion makes much of the "values" underlying Article 11, suggesting that it was designed to protect "the exchange of thoughts and ideas [and] personal trust between individuals." 173 Vt. at 365, 795 A.2d at 1230. The dissent fails to mention what we have characterized as the "core value that gave life to Article 11," the freedom from unreasonable *government* intrusions into the privacy of Vermont citizens. *Kirchoff*, 156 Vt. at 6, 587 A.2d at 992. That value finds its purest expression in the warrant requirement. "Although criminal defendants may seek court review of searches and seizures, these after-the-fact challenges do not serve Article 11's purpose of protecting the rights of everyone — law-abiding as well as criminal — by involving judicial oversight before would-be invasions of privacy." *Savva*, 159 Vt. at 86, 616 A.2d at 780.

The dissent would excuse the underhanded method the police utilized in this case to record the conversation with defendant, insisting that it was not "trickery." With respect, if it was not trickery to hide a tape recorder to secretly record a conversation with an unsuspecting citizen, what was it? Indeed, this case offers vivid testimony to our warning in *Savva* that "the social costs of eliminating the warrant requirement are simply too high. Without it, police behavior would be subjected to judicial scrutiny only in rare cases, while '[d]ay by day mischief may be done and precedents built up in practice long before the judiciary has an opportunity to intervene.'" *Id.* at 87, 616 A.2d at 780 (quoting *Harris v. United States*, 331 U.S. 145, 173 (1947)).

We thus categorically reject the State's claim "that one who shares his personal confidences with a police officer known to him as such does not have a legitimate expectation that his words will not be electronically seized." On the contrary, as Justice Harlan observed, "the burden of guarding privacy in a free society should not be on its citizens; it is *the Government* that must justify its need to electronically eavesdrop." *White*, 401 U.S. at 793 (Harlan, J., dissenting) (emphasis added). Having failed to do so in this case by establishing a reasonable justification for the recording before a

neutral magistrate, we conclude that the tape was properly suppressed.

Consistent with our earlier decisions in *Brooks* and *Blow*, our holding is necessarily limited to the facts before us involving a police interview in the privacy of the home, where our "sense of security," in Justice Harlan's words, is highest. *White*, 401 U.S. at 788 n.24; see also *Brion*, 652 A.2d at 289 (inside the home "a person may legitimately expect the highest degree or privacy known to our society"). The four out-of-state cases on which the State relies are thus fundamentally distinguishable, as all involved police interviews in other, more public settings that do not enjoy the same historical protection. In *City & Borough of Juneau v. Quinto*, 684 P.2d 127, 128-29 (Alaska 1984), the Alaska Supreme Court — distinguishing its earlier decision in *Glass* — upheld the warrantless recording of a suspect's conversation with a police officer on a public highway during the course of the defendant's apprehension and arrest for drunk driving. The court rejected the argument that the defendant enjoyed a reasonable expectation of privacy in such circumstances, where one "is aware, or reasonably should be aware, that he or she is speaking to a police officer who is in the process of executing either a lawful arrest or a lawful investigative stop." *Id.* at 129. The decision in *Quinto* is consistent with our holding in *Brooks* and many others holding that defendants do not enjoy a reasonable expectation of privacy when speaking with police officers in such public settings. It does not, however, justify a warrantless recording in the privacy of the home.

The State also relies on *In re A.W.*, 982 P.2d 842, 847 (Colo. 1999), which held that a defendant does not have a reasonable expectation of privacy precluding the warrantless recording of an interview in a police stationhouse. Although the court noted that defendant was "speaking in the · actual presence of a police officer," the court's holding cannot be separated from the fact that the defendant was not conversing in the privacy of his home, but inside the interview room of a municipal police department. *Id.* at 847. Similarly distinguishable is *Commonwealth v. Thorpe*, 424 N.E.2d 250 (Mass. 1981). There the defendant, a former police officer, contacted another officer with an offer to sell a copy of a police sergeant's promotional examination. The officer who was contacted secretly recorded eight telephone conversations and two face-to-face conversations with the defendant, one in a restaurant and another in a doughnut shop. The court upheld

the warrantless recording, broadly rejecting the proposition that "free speech and privacy values are unduly threatened by the risk that when one speaks to a known police officer he may be recording the conversation." *Id.* at 258. *Thorpe* did not, however, involve a police interview in the defendant's home and did not — despite its broad language — hold that a defendant speaking in the privacy of his or her home waives the right to be free from warrantless electronic surveillance and recording.

Nor, finally, does *Commonwealth v. Eason*, 694 N.E.2d 1264 (Mass. 1998), support the State's position. That case concerned the surreptitious monitoring and recording of a telephone conversation between the defendant and a confidential informant using an extension phone in the informant's home. The Massachusetts court distinguished its holding in *Blood*, observing that although the defendant was speaking from inside his home, he had no knowledge or control over "the conditions at the other end of [the] telephone conversation." *Id.* at 1268. Accordingly, the court concluded that the defendant did not enjoy the same expectation of privacy that inheres in face-to-face conversations occurring exclusively in a private home, *id.* at 1267, the situation we confront here.

Half a century ago, Justice Jackson explained that the warrant requirement forms the core of our privacy protections — not as a means to interfere with legitimate law enforcement efforts, but rather as a process to ensure that those efforts are properly balanced against the interests of "a society which chooses to dwell in reasonable security and freedom from surveillance." *Johnson v. United States*, 333 U.S. 10, 14 (1948). We have determined as a society that judging "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Id.* When all is said and done, that is the principle which we reaffirm today.

*Affirmed.*

**Skoglund, J.,** dissenting. I do not dispute the significance of the home as a place of heightened privacy expectations, but disagree with the majority's conclusion that the actions of the police in this case violated Article 11 of the Vermont Constitution. This Court has consistently held that the core value protected by Article 11 is freedom from unreasonable governmental intrusion into legitimate

expectations of privacy. *State v. Morris*, 165 Vt. 111, 115, 680 A.2d 90, 93 (1996); *State v. Savva*, 159 Vt. 75, 87, 616 A.2d 774, 780-81 (1991); *State v. Blow*, 157 Vt. 513, 517, 602 A.2d 552, 555 (1991); *State v. Brooks*, 157 Vt. 490, 493, 601 A.2d 963, 964 (1991); *State v. Kirchoff*, 156 Vt. 1, 5-6, 587 A.2d 988, 991 (1991). I suggest that there can be no legitimate or reasonable expectation that a conversational interchange between a suspect and police detectives investigating a crime will be private, regardless of where that conversation takes place.

A very brief review of the law of search and seizure under the Fourth Amendment to the United States Constitution is offered as an aid to understanding the error I see in the majority's approach. Before the 1967 case of *Katz v. United States*, 389 U.S. 347 (1967), neither wiretapping nor electronic eavesdropping violated a defendant's Fourth Amendment rights unless there had been an official search and seizure of his person, or such a seizure of his papers or his tangible material effects, or an actual physical invasion of his house "or curtilage" for the purpose of making a seizure. See *Olmstead v. United States*, 277 U.S. 438, 466 (1928) (evidence obtained from telephone calls intercepted without warrant was admissible as there was no entry into defendants' houses or offices); *Goldman v. United States*, 316 U.S. 129, 134-35 (1942) (use of a "detectaphone" held against the wall of adjoining office to overhear conversation of defendant was not violation of the Fourth Amendment, as "what was heard . . . was not made illegal by trespass or unlawful entry."). But where "eavesdropping was accomplished by means of an unauthorized physical penetration into the premises occupied" by the defendant, although falling short of a "technical trespass under the local property law," the Fourth Amendment was violated and any evidence of what was seen and heard, as well as tangible objects seized, was considered the inadmissible fruit of an unlawful invasion. *Silverman v. United States*, 365 U.S. 505, 509 (1961) (eavesdropping accomplished by means of "spike mike" inserted through wall of adjoining house made contact with heating duct in defendant's house, which then acted as a "giant microphone," held to violate Fourth Amendment rights.).

In *Katz*, the Supreme Court heard a challenge to evidence of petitioner's side of a phone conversation, overheard by FBI agents who had attached an electronic listening and recording device to the outside of the public telephone booth from which petitioner had

placed his calls. See 389 U.S. at 348. The petitioner had framed the issue as whether a public telephone booth is a constitutionally protected area so that a right to privacy attached. The Government maintained that it was not. The Court rejected this formulation of the issue: "In the first place, the correct solution of Fourth Amendment problems is not necessarily promoted by incantation of the phrase 'constitutionally protected area.'" *Id.* at 350. It wrote:

> this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Id.* at 351-52.

The Court held that the FBI should have obtained a warrant prior to the use of the electronic surveillance involved in the case. The import of the case is the Court's focus on the privacy expectations of the individual and not on the locus or extent of the government intrusion. "One who occupies [the phone booth], shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world." *Id.* at 352. *Katz* overruled *Olmstead* and *Goldman* and "swept away doctrines that electronic eavesdropping is permissible under the Fourth Amendment unless physical invasion of a constitutionally protected area produced the challenged evidence." *United States v. White*, 401 U.S. 745, 748 (1971).

After *Katz*, the concept of "constitutionally protected areas" no longer served as a "talismanic solution to every Fourth Amendment problem." 1 W. LaFave, Search and Seizure § 2.4(a), at 524 (3d ed. 1996). Justice Harlan, in his concurrence in *Katz*, summarized the appropriate analysis as follows: "that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not

'protected' because no intention to keep them to himself has been exhibited." *Katz*, 389 U.S. at 361.

We have adopted the United States Supreme Court's rationale in *Katz* and opined that Article 11 of the Vermont Constitution, "like the Fourth Amendment, protects people, not places." *State v. Zaccaro*, 154 Vt. 83, 90-91, 574 A.2d 1256, 1261 (1990) (citing *Katz*, 389 U.S. at 351). In those cases where we have interpreted Article 11 as providing broader protection than the Fourth Amendment of the United States Constitution, we have consistently, until today, used the "reasonable expectation of privacy" analysis that is the cornerstone of Fourth Amendment jurisprudence. For example, in *State v. Kirchoff*, 156 Vt. at 10, 587 A.2d at 994, we held that under Article 11 a lawful possessor has a "reasonable expectation of privacy" in affairs conducted in open fields where indicia, such as fences and "no trespassing" signs, would lead a reasonable person to conclude the area is private. We emphasized in *Kirchoff* that a person cannot rely on Article 11 to protect areas or activities that have been willingly exposed to the public. *Id.* at 7, 587 A.2d at 992-93.[1]

Again in *Savva*, 159 Vt. at 91-92, 616 A.2d at 783, we found a more expansive protection under Article 11 than under the Fourth Amendment for containers located in automobiles. We grounded our analysis on defendant's expectation of privacy in the packages contained in the hatchback of his vehicle and again noted that Article 11 does not protect areas willingly exposed to the public. *Id.* at 89, 616 A.2d at 782 .

It is true that, throughout Fourth Amendment and Article 11 jurisprudence, the home has enjoyed heightened privacy expectations. In emphasizing this principle, the majority finds support in two of our decisions. Both, I suggest, were decided on a reasonable expectation standard. In *State v. Blow*, 157 Vt. at 515, 602 A.2d at 553, a police informant was wired with electronic transmitter and sent to the defendant's house where he purchased marijuana. Defendant moved to suppress the tape recordings of the transactions and the officer's testimony about them. The judge allowed the detective to testify about the conversations between the informant and the defendant at the time of the sale. The recordings themselves

---

[1] In keeping with this approach, a few days after our decision in *Kirchoff* we decided *State v. Chester*, 156 Vt. 638, 587 A.2d 1008 (1991) (mem.), and found that the police did not violate Article 11 when they walked on land that lacked barriers or signs prohibiting entry.

were not introduced. In deciding the case, we acknowledged that the "assumption of the risk" rationale set out in *White*, 401 U.S. at 751-52, would preclude any finding of a violation of the federal constitution.[2] However, we then analyzed the defendant's claim under Article 11 using the "expectation of privacy" principles derived from *Katz*: (1) whether the defendant had "an actual (subjective) expectation of privacy" concerning his conversations in his home with an undercover police informant, and (2) whether the expectation is one that society is prepared to recognize as "reasonable." *Blow*, 157 Vt. at 517, 602 A.2d at 555 (quoting *Katz*, 389 U.S. at 361). We found that warrantless electronic participant monitoring conducted in a home offended defendant's expectation of privacy and the core values of Article 11 and suppressed the evidence. However, in emphasizing the importance of the home as a focus of Article 11 analysis in *Blow*, we did not signal "a return to the formalism of *Olmstead v. United States*, 277 U.S. 438 (1928), under which the privacy right was invaded *only* by a trespass to property. On the contrary, the privacy value should be protected wherever it is unreasonably threatened . . . ." *Blow*, 157 Vt. at 520, 602 A.2d at 556. It was the invasion of privacy that concerned us, not a mere trespass into the home.

A different result was obtained in *State v. Brooks*, 157 Vt. at 491-94, 601 A.2d at 963-65, where we considered a challenge to participant electronic monitoring where the wired informant and the defendant were in two adjacent vehicles in a parking lot. Applying the same "reasonable expectation of privacy analysis," we held that such monitoring was not regulated by Article 11: "[W]e find that defendant, regardless of what he actually expected, did not enjoy a reasonable expectation of privacy in a public parking lot." *Id.* at 493, 601 A.2d at 964.

Of course we hold a deeply rooted, subjective expectation of privacy in our homes. The right to retreat into our personal sanctuary — be it an apartment, a rented room, a hut or a mansion — and to be free from unreasonable governmental intrusion is at the heart of Article 11. The problem with the majority's approach to this

---

[2] In *White*, the United States Supreme Court held that the government use of informants equipped with concealed devices to record conversations with unknowing suspects did not violate the Fourth Amendment. 401 U.S. at 751. The federal constitutionality of warrantless electronic surveillance with the consent of one party to a conversation was upheld on the ground that when one speaks one voluntarily assumes not only the risk that one's listener may repeat what one says to others, but also the risk that the listener may be recording or monitoring the conversation for broadcast to others.

case is its near total reliance on the fact that the recorded conversation took place in defendant's home. It neglects to analyze whether the conversation was a private one, one in which an individual would retain a subjective expectation of privacy, and whether society is prepared to recognize that expectation as "reasonable."

"Article 11 protects the people from governmental intrusion into their private affairs; to the extent their affairs are willingly made public, the provision has no application." *Kirchoff*, 156 Vt. at 7, 587 A.2d at 993. "In determining whether persons have a privacy interest in any given area or activity, we examine both private subjective expectations and general social norms." *State v. Morris*, 165 Vt. at 115, 680 A.2d at 94 (citing *Blow*, 157 Vt. at 517-18, 602 A.2d at 555).

First, let us not forget, defendant invited the officers into his home and agreed to talk with them about allegations that he had engaged in sexual acts with a foster child. By speaking freely with officers, whom he understood were investigating his possible involvement in a serious crime, defendant could not have had a reasonable expectation that the questioning was private or would be kept private. The same conclusion is reached even viewing the facts of this case with a mind towards the heightened privacy expectation generally associated with one's home. This is not a conversation over a kitchen table between friends. He knew who he was talking to, and the purpose of the officers' visit. Would society think he had a legitimate or reasonable expectation that this exchange with police would be private? I think not.

As in *Blow*, the majority finds support in *Commonwealth v. Blood*, 507 N.E.2d 1029 (Mass. 1987), and in *State v. Glass*, 583 P.2d 872 (Alaska 1978). However, in these cases the conversations the courts held to enjoy an expectation of privacy were captured by *confidential informants* in the defendants' homes. In neither case did the defendants have reason to suspect that their conversation partners were working with the government. And, in both cases the courts anchored their analysis in whether the expectation of privacy was one society was willing to embrace. "When we confront the question whether police activities amount to a search or seizure within the meaning of art. 14 [of the Massachusetts Declaration of Rights], we ask, 'whether the defendants' expectation of privacy [in the circumstances] is one which society could recognize as reasonable.'" *Blood*, 507 N.E.2d at 1033 (citing *Commonwealth v. Podgurski*, 436

N.E.2d 150, 152 (1982)). "[O]ne communicating private matters to another exhibits an actual (subjective) expectation of privacy whether or not the listener is equipped with electronic devices. The key question is whether that expectation of privacy is one that society is prepared to recognize as reasonable." *Glass*, 583 P.2d at 880.

Another Massachusetts case, *Commonwealth v. Thorpe*, 424 N.E.2d 250 (Mass. 1981), provides a succinct summation of why privacy is protected and whether warrantless, secret recordings of conversations between known police officers and suspects undermine this protection. In *Thorpe*, defendant moved to suppress certain tape recordings of conversations between himself and a police officer to whom he offered to sell a copy of a police sergeant's promotional examination. Wearing a tape recording device, the officer had several conversations with Thorpe. On appeal, Thorpe argued that the warrantless recordings violated his right to be free from unreasonable searches and seizures as guaranteed by art. 14 of the Massachusetts Declaration of Rights because he had an expectation of privacy in not having his conversation with the officer recorded. The court rejected this argument and held:

> We do not think that free speech and privacy values are unduly threatened by the risk that when one speaks to a *known* police officer he may be recording the conversation. This is not the type of warrantless surveillance condemned by the courts and commentators . . . , whose impact on privacy is "such as to undermine that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in a free society."

*Thorpe*, 424 N.E.2d at 258 (citing *White*, 401 U.S. at 787 (Harlan, J., dissenting)) (emphasis added).

Analysis of privacy expectations in situations such as that present in *Thorpe*, where defendant is aware that he is talking to police, requires an evaluation of the values intended to be protected by Article 11, such as the exchange of thoughts and ideas, personal trust between individuals, free expression and individuality, or as stated by the court in *Thorpe*, the "confidence and sense of security in dealing with one another." 424 N.E.2d at 258. While it is certainly true that surreptitious recording of conversations between citizens can have a chilling effect of such forms of freedom, this effect is

rendered de minimis "when one is aware, or reasonably should be aware, that he or she is speaking to a police officer." *City & Borough of Juneau v. Quinto*, 684 P.2d 127, 129 (Alaska 1984) (tape recording of defendant's conversation with police officer was properly admitted into evidence at trial, when defendant knew, or reasonably should have known, that he was speaking to police officer); *People v. Suite*, 161 Cal. Rptr. 825, 829 (Ct. App. 1980) (holding that defendant's reliance on cases decided on a "reasonable expectation of privacy" standard was "sorely misplaced" when he sought to suppress recordings of telephoned bomb threats to police, observing that it was "ludicrous" for defendant to argue that his calls to police were confidential communications); *In re A.W.*, 982 P.2d 842, 847 (Colo. 1999) ("[O]ne who is speaking in the actual presence of a police officer or detective has neither a subjectively nor an objectively reasonable expectation of privacy."); *State v. Bonilla*, 598 P.2d 783, 784-86 (Wash. Ct. App. 1979) (where defendant called police dispatcher and confessed to murdering his wife, while other officer listened in on extension lines, "[i]t would strain reason for [defendant] to claim he expected his conversations with the police dispatcher to remain purely between the two of them.").

I return again to the fact that defendant invited the officers into his home and agreed to answer questions surrounding their investigation. There is no dispute that his consent was voluntary. When consent is given to a search or seizure, there is usually no violation of Article 11. See *State v. Sheehan*, 171 Vt. 642, 643, 768 A.2d 1275, 1278 (2000) (mem.); *Zaccaro*, 154 Vt. at 90, 574 A.2d at 1261; *State v. White*, 129 Vt. 220, 224, 274 A.2d 690, 692 (1971).

For example, in *Sheehan*, the defendant argued that his consent was not voluntary, contending that police deceived him because their request to enter the home to talk with him was a pretext to gain entry to arrest him. In finding that his consent was indeed voluntary, we relied on the fact that the uniformed police identified themselves, asked defendant's consent to enter the residence so that they could talk to him, and that the scope of the conversation was not limited or defined. "Once inside, the police acted within the scope of their broad invitation and did precisely what they said they would, talk to defendant. Nothing about the police officers' behavior suggests that they engaged in trickery or misrepresented their purpose in order to gain entry into defendant's home." *Sheehan*, 171 Vt. at 643, 768 A.2d at 1278. Like the officers in *Sheehan*, the officers in the case before

us did not misrepresent their purpose or engage in trickery in order to gain entry into defendant's home, or to induce him to speak with them. And, in fact, they specifically told him what topic they wanted to talk about — the allegations brought against him by a foster child.

Ah, but was it a trick to secretly record the conversation that ensued?

In *State v. Costin*, 168 Vt. 175, 181, 720 A.2d 866, 870 (1998), we analyzed the situation where law enforcement had placed video surveillance cameras on a suspected marijuana field. We dismissed the claim that the video surveillance alone created an Article 11 search. "We do not see how Article 11 protects against the use of a technological device that accomplishes the same result as a lawful in-person stake-out, and nothing more." *Id.* Here, we have a lawful, consented to conversation with investigating officers. The fact that they captured the defendant's voluntary statements using a technologically superior means to the note-taking and memories of the officers does not " 'transmogrify a constitutionally innocent act into a constitutionally forbidden one.' " *Id.* (quoting *Vega-Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 181 (1st Cir. 1997)).

In *Lopez v. United States*, 373 U.S. 427 (1963), the Supreme Court upheld the use of a wire recording of a conversation between the defendant and an Internal Revenue Service agent that occurred in defendant's office during which the defendant offered the agent a bribe. The IRS agent had recorded the conversation on a small recording device carried in his pocket. While the decision in *Lopez* was based, not on consideration of the defendant's expectations of privacy, but on outmoded considerations that "no trespass was committed,"[3] the reasoning quoted below does not suffer from the difference in approach and is strikingly similar to the reasoning we utilized in *Costin*. The Court wrote:

> Once it is plain that [the agent] could properly testify about his conversation with Lopez, the constitutional claim relating to the recording of that conversation emerges in proper perspective. . . . Indeed this case involves no "eavesdropping" whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead,

---

[3] The decision in *Lopez* predated the Court's change in approach set forth in *Katz*. At the time of *Lopez*, it was "insisted only that the electronic device not be planted by an unlawful physical invasion of a constitutionally protected area." *Lopez*, 373 U.S. at 438-39.

the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose. . . . [The device] was carried in and out by an agent who was there with petitioner's assent, and it neither saw nor heard more than the agent himself.

*Lopez*, 373 U.S. at 438-39.

In a criticism of the majority's approach in *Costin*, the dissent suggested the Court was "resurrect[ing] an outdated, formalistic analysis that rigidly focuses on mapping out property worthy of constitutional protection while ignoring modern search-and-seizure law, which examines expectations of privacy and societal interests." 168 Vt. at 184, 720 A.2d at 872. This, I suggest, is what is happening here. Whether we are dealing with open fields as in *Costin* and *Kirchoff*, or garbage left on the curb as in *State v. Morris*, 165 Vt. at 115-16, 680 A.2d at 93-94, or events that transpire in the home as in *Blow*, the core principle that triggers Article 11 protection is the individual's expectation of privacy and not the location of the government activity challenged.

Because Article 11 protects people, not places, in this case, the location of the conversation is constitutionally immaterial. I would hold that the recording of defendant's conversations with the police officers under these circumstances was not a violation of any right guaranteed to him by Article 11 of the Constitution of the State of Vermont and that the court erred in suppressing evidence of that tape recording on the grounds stated. As stated in *Lopez*:

Stripped to its essentials, [respondent's] argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory.

373 U.S. at 439.

I hesitate to speak for society as a whole, but respectfully suggest that Vermonters would not find reasonable a suspect's expectations that his responses to police questions about possible involvement in a crime are private. I am authorized to state that Chief Justice Amestoy joins in this dissent.